# EXHIBIT A

1   THE LAW OFFICE OF JASON B. CRUZ
    Jason Cruz, Esq. (SBN 203133)
2   18 E. State Street, Suite 203-1
    Redlands, California 92373
3   jcruz@jcruzlaw.com
    Phone:  (714) 221-0644
4   Facsimile:  (866) 838-8344

5   LYNCH COX GILMAN & GOODMAN, P.S.C.
    John Cox, Esq. (Admitted in KY)
6   500 W. Jefferson Street, Suite 2100
    Louisville, Kentucky 40202
7   jcox@lynchcox.com
    Phone:  (502) 589-4215
8   Facsimile:  (502) 589-4994
    Attorneys for Dark Hall Productions, LLC and Matthew Arnold
9

10                   UNITED STATES DISTRICT COURT

11        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13  YOON CHUL YOO, et al.            CASE NO.:  CV09-7483 MMM (CWx)

14              Plaintiff,           **AFFIDAVIT OF MATTHEW ARNOLD**

15      v.

16  MATTHEW ARNOLD, et al.

17              Defendants.

18

19

20  MATTHEW ARNOLD, et al.

21              Counter-Plaintiff,

22      v.

23  YOON CHUL YOO, et al.

24              Counter-Defendants.

25

26              **AFFIDAVIT OF MATTHEW ARNOLD**

27

28      I, Matthew Arnold, after having been duly sworn, state as follows:

1

1.    I am the managing member of the Counterclaim Plaintiff, Dark Hall Productions, LLC.

2.    I am an individual over the age of 18 and have personal knowledge of the facts set forth herein and if called upon to testify as a witness I could and would competently testify thereto under oath.

3.    I formed Dark Hall Productions, LLC on April 23, 2007 in part to oversee the production of a motion picture which is to be entitled "The Door."

4.    Beginning in around December of 2003 I was a Professor of Film at the New York Film Academy.

5.    This is where I met Sophia Jee Yoo ("Sophia Yoo") as a student in my class in the winter of 2006.

6.    Some time in early February of 2007, Sophia Yoo contacted me by telephone requesting an interview for a Korean magazine she either represented or worked for, to which I agreed.

7.    During the course of the interview, I stated that my main focus at the time, in addition to teaching, was to raise financing for my film entitled "The Door."  At the time I had just completed writing the screenplay and was prepared to move forward with the script with the end goal of producing and directing a feature film.

8.    Sophia Yoo immediately expressed interest and represented that she was capable of making or raising an investment.  At the conclusion of the interview, we agreed to meet again to further discuss potential financing.

9.    In a follow-up meeting shortly thereafter, Sophia Yoo represented that her father, the Counterclaim Defendant Yoon Chul Yoo ("Mr. Yoo"), who is acting on behalf of himself and similarly situated investors in the filing of this lawsuit, was interested in financing the picture and

further that Mr. Yoo knew of potential investors who Mr. Yoo believed may also invest in the picture.

10.     After some discussion, it was eventually settled that the budget for the movie and the amount which I sought to be raised, would be $4.5 million dollars.

11.     After Ms. Yoo indicated that she and Mr. Yoo could help raise the $4.5 million which was sought and in reliance upon their recommendation and assurances that they could assist in raising these funds, I quit my job and made a trip to Korea to meet Mr. Yoo in person along with other potential investors.

12.     My trip to Korea lasted from approximately March 13, 2007 through March 31, 2007.

13.     One of the first meetings arranged by Mr. Yoo and his daughter was with an individual named Mr. Myung Hoon Jung who represented a company called KTF.  KTF was a participant in a film fund named Boston Entertainment Partners ("Boston Entertainment").  The Boston Entertainment fund would eventually make an investment in "The Door."

14.     During my stay in Korea, Mr. Yoo also arranged for various other meetings with potential investors including with Ki Woong Kim who was the President and CEO of Korean Business News ("KBN") which also eventually invested in "The Door".

15.     Mr. Yoo also agreed to invest through his company Sae Kwang Chemical Company LTD ("Sae Kwang").  Collectively Sae Kwang, Boston Entertainment and KBN are referred to as the "Investors".

16.     Thereafter the following investments were made by these three Investors via wire transfer into Dark Hall's bank account on the following dates:

a.     $1,072,846.26 on May 25, 2007 from KBN;

b.     $532,990.00 on May 29, 2007 from Boston Entertainment;

3

AFFIDAVIT OF MATTHEW ARNOLD

c.      $1,076,078.00 on May 29, 2007 from Sae Kwang; (Mr. Yoo's company); and

d.      $1,066,660.00 on June 4, 2007 from Boston Entertainment.

17.     Attached hereto as **Attachment No. 1** is a true and correct copy of a Washington Mutual bank statement setting forth the wire amounts into Dark Hall's account in the total amount of $3,748,634.26.

18.     At the same time it was confirmed that the other funds had been wired, the Yoos confirmed receipt from the fourth investor of $800,000.00.  These funds were never forwarded to Dark Hall, but were instead maintained by Sophia Yoo.  I do not recall the name of this investor or have a written record, but I participated in a meeting in Japan in which an agreement was made to wire the $800,000 from Korea to Japan and then on to the United States. Ms. Yoo was to infuse these funds into the production from her company Dragon Noon in order to show an investment in a United States corporation as part of her attempt to obtain an EB-5 visa.

19.     Each of the Investors was provided with an Investor Agreement that each agreed to based on its respective investment.  I was advised by Sophia Yoo and Mr. Yoo before the funds were wired that these had each been signed by each investor.  The respective investor agreements are attached as **Attachment No. 2**.  Each is identical except as to the amount and the name of the investor.  Ms. Yoo was responsible for maintaining these agreements.  As she was my partner at the time, I made no point to get my own copy and relied on her word.  Although I was assured each had been signed including one indicating Mr. Yoo/Sae Kwang's investment, I did not see evidence of this until one was produced when Boston Entertainment filed suit against Ms. Yoo.  Because Mr. Yoo has failed to respond to document requests, I am unable to produce the others.

20.     In June 2007 with funding in place, I began discussions with Sophia Yoo as to our respective salaries for the movie that would be drawn from Dark Hall's account.  It was agreed

4

AFFIDAVIT OF MATTHEW ARNOLD

that I would receive directing and producing fees in addition to a fee for the right to use "The Door" screenplay.  Sophia Yoo would receive an executive producing fee plus a percentage of the money she raised and negotiated with the Investors.  All of her expenses would be reimbursed prior to the Investors' returns.

21.     Later in June of 2007, I began leveraging all of my contacts within the industry to research and scout potential locations and meet with producers, casting directors, line producers, post-production supervisors, writers, a director of photography and actors, and making rewrites to the script.

22.     Pursuant to the agreement with Sophia Yoo, on June 28, 2007 I transferred $20,000.00 to myself as a partial salary.

23.     Beginning in July of 2007, Ms. Yoo and I began to have problems concerning the project.

24.     In early July 2007, Ms. Yoo frantically called me stating that she had made a "big mistake."  She claimed that the Investors, including Mr. Yoo, were upset that she was not in control of the money and it was sitting in Dark Hall's account.  She also claimed that the Investors questioned the fact that I had withdrawn a salary from the account and had placed the funds in an account which drew interest.

25.     At that point, Ms. Yoo demanded that I transfer all of the funds into a Korean bank account to allegedly make the Investors feel more comfortable and to give her direct control over the financing.

26.     Of course I did not agree to this as there was no way we could make the film with the money sitting in a bank account in Korea. It was also contrary to our agreement that she would control the funding.  His role was simply to raise the financing.  Furthermore, under the investment agreements with the Investors the funds were explicitly Dark Hall's and all of the

5

AFFIDAVIT OF MATTHEW ARNOLD

creative and financial concerns were my responsibility.

27.     On July 16, 2007 I received an electronic message from Harris Tulchin, Esq. claiming to represent all of the Investors, including Mr. Yoo, with regards to "The Door". The electronic message is attached hereto as **Attachment No. 3**.

28.     On July 21st, 2007, after various discussions back and forth as to what would occur, I received a message through my counsel from Mr. Tulchin indicating that one of the principal investors was arriving from Korea and was requesting a meeting at Mr. Tulchin's office along with Ms. Yoo. I would later find out that this investor was Mr. Yoo. The meeting was set for July 25, 2007.

29.     At the July 25, 2007 meeting I was advised by Ms. Yoo that her father, Mr. Yoo, who had requested the meeting in the first place, refused to attend because he was very upset that the money was transferred into an interest bearing account. Ironically, Mr. Tulchin had suggested in an earlier e-mail that those funds be transferred into an interest bearing account.

30.     I was offered two options to resolve the dispute: (1) to return all of the money to the Investors; or (2) give some of the spending control to Sophia Yoo and draft an amended investment agreement which gave the Investors more control. Otherwise, I was told by Ms. Yoo that the Investors would take legal action against me.

31.     I advised all of the parties at the meeting that all I wanted to do was make the movie and it would satisfy the Investors concerns, I was willing to give joint spending control to Sophia Yoo if we could reach an agreement as to spending (or otherwise accommodate their needs) so that we could proceed with the film.

32.     Thereafter on July 31, 2007, Mr. Tulchin again called requesting yet another meeting and advised that Mr. Yoo was planning on being present at this meeting.

33.     At this second meeting, Mr. Tulchin assured everyone present that Mr. Yoo had

6

AFFIDAVIT OF MATTHEW ARNOLD

the authority to speak on behalf of all of the Investors and that Mr. Tulchin was representing their intentions collectively with signed authorizations or powers of attorney.  I was also provided the letters from Boston Entertainment and KBN (both attached as **Attachment No. 4**) to this effect which confirmed Mr. Yoo was their agent.  I also knew from my trip to Korea that Mr. Yoo had the authority to speak for the other investor, Sae Kwang, which he owned.  As such I reasonably believed and continue to believe he was speaking for all of the Investors.  It was not until Boston Entertainment filed suit against Sophia Yoo in late 2010, well after Dark Hall obtained the judgment described below, that I learned the Investors and the Yoos may have a disagreement.  By that point virtually all of the damage to Dark Hall had been done.

34.     At that second meeting, Mr. Yoo proceeded to state the reasons why he and the Investors were upset.  He stated that the Investors believed that Kevin Costner, Bruce Willis or Nicholas Cage was going to be in the movie.  This was never represented and I do not know how he could have honestly believed that.

35.     He then gave me an ultimatum.  He represented that if I did not do what the Investors wanted I would be sued.  He further represented the following:

- That he was authorized to act and speak for all of the Investors in "The Door";

- That the Investors desired to begin production on "The Door" immediately, but at the reduced budget of $2 million dollars;

- That the Investors thought the budget of the film was only $2 million dollars and the remaining $2.5 million was to get certain actors.

- That $1,761,141.82 must be immediately returned to the Investors through Sophia Yoo;

⊙    That the remaining $1.945 million representing the new budget would be held in an account jointly controlled by Sophia Yoo and Mr. Arnold for which both of their authorizations and presence would be necessary for any withdrawal.

36.    These representations would all turn out to be false.

37.    Had I known the actual facts I never would have agreed to the reduced budget, the return of $1.76 million dollars to Sophia Yoo to purportedly return to the investors, or the transfer of $1.945 million into an account which had any involvement with Sophia Yoo.

38.    I now know that Mr. Yoo apparently made these false statements in order to induce me to give up control of the funds. At the meeting he stated that the investors would give me another chance to make the film at a $2 million dollar budget. He explained that if I agreed to the reduced budget that I was to immediately transfer $2 million dollars to a jointly controlled bank account between Sophia Yoo and myself, with the remaining balance of $1,761,141.82 to be returned to the investors through Sophia Yoo, they would not file suit.

39.    As a result, under threat of litigation and in reliance upon Mr. Yoo's representations that the $1.76 million would be returned to investors and the $2 million could be used to make the movie, I had a check issued to Sophia Yoo to return to the Investors for $1,761,141.82, and a second check for $1,945,000.00 (the $2 million dollars less what had been spent to date on salaries and toward the movie) issued to both of us to be taken to the Bank of America branch for the opening of a new account. (See checks attached as **Attachment #11**)

40.    The agreement with Mr. Yoo and the Investors in opening the Bank of America account was for the funds to remain there until a formal document could be prepared to control spending. As a result, and based on assurances from Bank of America that the account type which was opened with the notations/instructions/warnings would serve our needs, the money was deposited in the Bank of America. Notations/instructions/warnings were added to the

8

AFFIDAVIT OF MATTHEW ARNOLD

account based on the Bank's agreement that no withdrawals could be made without both the presence of myself and Ms. Yoo, nor could checks be negotiated without both of our signatures. (See Account Notes attached as **Attachment No. 5**).

41.     After several unsuccessful attempts to communicate and reach the aforementioned agreement as to the spending of funds at Bank of America, and after receiving no response from the Yoos or their counsel, I grew suspicious.

42.     As a result, after several weeks of not hearing anything, on September 17, 2007 I went to the Bank of America branch where we opened the account.

43.     Upon the request for an account balance, the teller at the bank informed me that $1,945,000.00 was wired out of the account on August 22, 2007, roughly three weeks after its deposit.  Despite the agreement and notes on the account indicating "two signers must be present in order to make any withdrawals" and "checks must have two signatures in order to negotiate them" the withdrawal was permitted by Bank of America.  I believe from statements made my by Sun Yoo about her friend being a vice president at a Bank Of America branch, and her and her father's insistence that we now use Bank of America instead of the Washington Mutual where the funds were previously held, that the Yoos knew someone at the bank that permitted this to occur.

44.     At no time before or after this was discovered on September 17, 2007, did I ever authorize the transfer of money out of the Bank of America account, nor did I ever receive any contact from the bank to authorize such a transfer.  In fact, Mr. Yoo and the Investors had avoided communicating with me.

45.     The representations made by Yoon Chul Yoo, individually and on behalf of himself and similarly situated investors, were a ruse.  All of his actions along with those of his daughter, Sophia Yoo, (as confirmed by the state court jury in the prior action described in paragraphs 47 through 53) were in an effort to exclude me and Dark Hall from "The Door".

9

46.     At all times during my negotiations with Mr. Yoo and Ms. Yoo, I justifiably relied upon his representations and actions, as well as the actions of the Investors when I was in Korea, which confirmed that Mr. Yoo and Ms. Yoo were agents for the Investors as set forth in paragraph 33 herein.  At all times hereto I reasonably believed Mr. Yoo was acting within the course and scope of his agency for the Investors.     (This is confirmed by the filing of his complaint in this action).

47.     As a result of these actions, I was forced to file a lawsuit on October 9th, 2007 against Sophia Yoo styled <u>Dark Hall Productions v. Sophia Jee Yoo, Yoon Chul Yoo and Dragon Noon Productions, LLC</u>.  Therein the Complaint alleged ten causes of action including fraud and deceit, conversion, breach of contract and unjust enrichment against Sophia Yoo and Mr. Yoo (attached as **Attachment No. 6**).

48.     In or about November of 2007, Dark Hall obtained an injunction freezing the $1.945 million taken without Mr. Arnold's authorization or knowledge from the Bank of America account.

49.     Thereafter, from August 21 to September 11, 2008, the counsel for Dark Hall made 13 attempts to serve Yoon Chul Yoo at the address which he was most likely to be found which was his daughter's home in Los Angeles, California (see, **Attachment No. 7**).  It was our understanding then that Mr. Yoo was present in the country at the time because Ms. Yoo had previously indicated he visited her annually at that time.  Moreover, Mr. Yoo had been aware of the lawsuit against Ms. Yoo and himself since early in the lawsuit as he was paying for her defense.  I also understand he routinely met with the Investors to report on the progress as Ms. Yoo testified this was done weekly.  In addition, he was named as a witness by Ms. Yoo on September 17th, 2009, and on September 30, 2009 Mr. Yoo was present in Court for the first day of trial.  Once we actually saw Mr. Yoo in the United States, we immediately sent a private

10

AFFIDAVIT OF MATTHEW ARNOLD

investigator to follow Mr. Yoo to determine his address so that we could again attempt to serve him in the United States. Mr. Yoo eluded the private investigator and did not appear in court again, thwarting our efforts to serve him. Nonetheless, because he had not been served, the Court dismissed the claims against him without prejudice.

50.    Subsequently, on September 23, 2009 because he had been listed as a witness, the court ordered Sophia Yoo to make Mr. Yoo available for deposition. On September 28, 2009, the parties stipulated that Dark Hall would not depose Mr. Yoo and Sophia Yoo could not call him as a witness (**Attachment No. 8**).

51.    On October 15, 2009 a state court jury returned a verdict of $3.7 million dollars in favor of Dark Hall for its breach of contract, conversion and fraud against Sophia Yoo. The jury also assessed punitive damages against Sophia Yoo of $60,000.00. Approximately one hour after the jury verdict returned, this action by Mr. Yoo and similarly situated investors was filed against me and Dark Hall.

52.    The findings in the State Court action included:

- That Sophia Yoo used a wrongful act or wrongful threat to pressure Arnold, on behalf of Dark Hall, into consenting to a contract (Verdict Form, Attachment No. 9 to p. 5);

- That Sophia Yoo made a false representation if an important fact to Arnold on behalf of Dark Hall (Attachment No. 9 at p. 7);

- That Sophia Yoo knew that the representation was false or made the representation recklessly and without regard for its truth (Attachment No. 9 at p. 7);

- That Sophia Yoo intended that Arnold, on behalf of Dark Hall Productins, would rely on the representation (Attachment No. 9 at p. 7);

- That Arnold, on behalf of Dark Hall Productions, reasonably relied on the representation (Attachment No. 9 at p. 8);

- That Sophia Yoo, intentionally failed to disclose an important fact that Arnold, on behalf of Dark Hall, did not know and could not reasonably have discovered (Attachment No. 9 at p.10);

AFFIDAVIT OF MATTHEW ARNOLD

- That Sophia Yoo intended to deceive Arnold, on behalf of Dark Hall, by concealing the fact (Attachment No. 9 at p.10);

- That Arnold, on behalf of Dark Hall, relied on Sophia Yoo's deception and that his reliance was reasonable under the circumstances (Attachment No. 9 at p. 11);

- That Sophia Yoo's concealment was a substantial factor in causing harm to Dark hall ( Attachment No. 9 at p. 11);

- That Sophia Yoo did not intend to perform a promise made to Arnold on behalf of Dark Hall that was important to the transaction when she made it (Attachment No. 9 at p. 12);

- That Arnold, on behalf of Dark Hall, reasonably relied on this promise (Attachment No. 9 at p. 13);

- That Sophia Yoo failed to perform the promised act (Attachment No. 9 at p. 13);

- That Arnold/Dark Hall's reliance on Sophia Yoo's promise was a substantial factor in causing harm to Dark Hall (Attachment No. 9 at p. 13);

- That Sophia Yoo engaged in the conduct with malice, oppression or fraud (Attachment No. 9 at p. 18); and

- That Dark Hall's damages totaled $3.7 million (Attachment No. 9 at p. 9).

53.     After post trial motions were denied, a judgment was entered in favor of Dark Hall for $3.7 million plus $60,000 in punitive damages.  The Court eventually ordered that the $1.945 million that was attached at the outset of the case be turned over to Dark Hall.  Thus there remains an additional $1,815,000.00 that was never paid on the judgment, plus interest.

54.     In pursuing Ms. Yoo the total amount of attorneys fees and expenses which I incurred as a result of the actions beginning from September 2007 up until August of 2010 when I changed law firms, was $942,457.46.  In addition since I changed law firms Dark Hall has paid an additional $21,002.69 in an effort to defend that matter on appeal, as well as in  pursuing Ms. Yoo in the bankruptcy she has filed to attempt to collect these funds.

55.     In addition, I was forced to pursue Bank of America to attempt and try to recover these funds as a result of their failure to comply with the instructions that were placed on the

12

AFFIDAVIT OF MATTHEW ARNOLD

account which required the presence of both myself and Ms. Yoo before this money could be withdrawn. The current amount of legal fees Dark Hall has incurred against Bank of America is $194,301.03.

56.     In this action by Mr. Yoo and similarly situated investors, Dark Hall has incurred legal fees of $86,453.61.

57.     For ease of reference I have prepared a chart reflecting Dark Hall's damages as a result of the actions of Mr. Yoo as **Attachment No. 10** hereto. This also includes interest at 8% on the various funds it should have received. I have not included interest on any attorneys fees despite the fact Dark Hall borrowed money and was required to pay interest on those funds in order to pay the attorneys fees.

58.     At all times prior to any breach by the Investors, Dark Hall performed its obligations under the investor agreements as well as any oral agreements.

59.     In Paragraph 8 of the investor agreement each investor promised that they would "defend, indemnify, and hold Company, its licensees and assigns, and the directors, officers, employees and agents of the foregoing, harmless from third party claims, liabilities, damages, costs and reasonable outside legal fees (collectively "claims") arising from any breach by investor of any representation, warranty, or agreement made by investor hereunder."

60.     The investors have breached this agreement as a result of their conduct in failing to fund the movie as agreed and deceptively through its agent, Mr. Yoo, converting Dark Hall's funds.

Further, affiant sayeth naught.

AFFIDAVIT OF MATTHEW ARNOLD

Further, affiant sayeth naught.

I declare under penalty of perjury under the laws of the United States and California that the foregoing is true and correct.

Matthew

Arnold

Subscribed and sworn to before me by Matthew Arnold this 28th day of June, 2011.

_____
Notary Public

SOMALIA SLOANE GOLDSBY
COMM. 1826399
NOTARY PUBLIC CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Dec. 11, 2012

Commission Expires

Date

14

AFFIDAVIT OF MATTHEW ARNOLD

# ATTACHMENT 1

# ⑩ WaMu

## Transaction History

Account: FREE BUSINESS CHECKING/******3488

FREE BUSINESS CHECKING  Ledger Balance:  $514.26

| Date ▾ | Description | Check # | Debit(–) | Credit(+) | Running Balance |
|---|---|---|---|---|---|
| 07/11/2007 | Check – 0000001001 | 1001 | –$30,000.00 | | $514.26 |
| 07/03/2007 | 9245 WILSHIRE BLVD. BEVERLY HILLS 0703 G | | | +$30,000.00 | $30,514.26 |
| 06/29/2007 | FEE: OUTGOING DOMESTIC WIRE | | –$20.00 | | $514.26 |
| 06/29/2007 | DOMESTIC OUTGOING WIRE | | –$5,000.00 | | $534.26 |
| 06/28/2007 | *TRANSFER WITHDRAWAL | | $3,723,000.00 | | $5,534.26 |
| 06/28/2007 | *TRANSFER WITHDRAWAL | | –$100.00 | | $3,728,534.26 |
| 06/28/2007 | *TRANSFER WITHDRAWAL | | –$20,000.00 | | $3,728,634.26 |
| 06/04/2007 | FEE: INCOMING DOMESTIC WIRE | | –$10.00 | | $3,748,634.26 |
| 06/04/2007 | WIRE TRANSFER DEPOSIT | | | +$1,066,660.00 | $3,748,644.26 |
| 05/29/2007 | FEE: INCOMING DOMESTIC WIRE | | –$10.00 | | $2,681,984.26 |
| 05/29/2007 | WIRE TRANSFER DEPOSIT | | | +$1,076,078.00 | $2,681,994.26 |
| 05/29/2007 | FEE: INCOMING DOMESTIC WIRE | | –$10.00 | | $1,605,916.26 |
| 05/29/2007 | WIRE TRANSFER DEPOSIT | | | +$532,990.00 | $1,605,926.26 |
| 05/25/2007 | FEE: INCOMING DOMESTIC WIRE | | –$10.00 | | $1,072,936.26 |
| 05/25/2007 | WIRE TRANSFER DEPOSIT | | | +$1,072,846.26 | $1,072,946.26 |
| 05/14/2007 | *OPENING DEPOSIT | | | +$50.00 | $100.00 |
| 05/14/2007 | *TRANSFER DEPOSIT | | | +$50.00 | $50.00 |

Deposits are accepted by Washington Mutual Bank (WMB) and Washington Mutual Bank fsb and are FDIC insured.

Commercial Capital Bank, FSB (CCB) has merged into WMB and as a result, their deposits will be combined for FDIC insurance purposes. For an interim period, WMB will operate under the name of CCB as well as the name of WMB, but WMB cannot currently provide service on CCB accounts and CCB cannot currently provide service on WMB accounts.

🏠 EQUAL HOUSING LENDER

© 2007 Washington Mutual, Inc. All Rights Reserved.

Ex 11

# WaMu

## Transaction History

Account: PLATINUM BUSINESS SAVINGS/*****4782

PLATINUM BUSINESS SAVINGS   Ledger Balance:   $3,694,202.58

| Date ∨ | Description | Check # | Debit(-) | Credit(+) | Running Balance |
|---|---|---|---|---|---|
| 07/03/2007 | 9245 WILSHIRE BLVD. BEVERLY HILLS 0703 G | | $30,000.00 | | $3,694,202.58 |
| 06/29/2007 | *INTEREST PAYMENT | | | +$1,202.58 | $3,724,202.58 |
| 06/28/2007 | *TRANSFER DEPOSIT | | | +$3,723,000.00 | $3,723,000.00 |

Deposits are accepted by Washington Mutual Bank (WMB) and Washington Mutual Bank fsb and are FDIC insured.

Commercial Capital Bank, FSB (CCB) has merged into WMB and as a result, their deposits will be combined for FDIC insurance purposes. For an interim period, WMB will operate under the name of CCB as well as the name of WMB, but WMB cannot currently provide service on CCB accounts and CCB cannot currently provide service on WMB accounts.    EQUAL HOUSING LENDER

© 2007 Washington Mutual, Inc. All Rights Reserved.

Exhibit A Page 18 of 117

Washington Mutual | Servicing

# WaMu

## Transaction History

**Account:** FREE BUSINESS CHECKING/******6089

**FREE BUSINESS CHECKING** Ledger Balance: **$100.00**

| Date ⌄ | Description | Check # | Debit(-) | Credit(+) | Running Balance |
|---|---|---|---|---|---|
| 06/28/2007 | *TRANSFER DEPOSIT | | | +$100.00 | $100.00 ⊠ |

Deposits are accepted by Washington Mutual Bank (WMB) and Washington Mutual Bank fsb and are FDIC insured.

Commercial Capital Bank, FSB (CCB) has merged into WMB and as a result, their deposits will be combined for FDIC insurance purposes. For an interim period, WMB will operate under the name of CCB as well as the name of WMB, but WMB cannot currently provide service on CCB accounts and CCB cannot currently provide service on WMB accounts.   EQUAL HOUSING LENDER

© 2007 Washington Mutual, Inc. All Rights Reserved.

Exhibit A Page 19 of 117

# ATTACHMENT 2

## INVESTMENT AGREEMENT

THIS INVESTMENT AGREEMENT (the "*Agreement*"), entered into in connection with the motion picture tentatively entitled *The Door* (the "*Picture*"), is made as of this ___th day of _____, 2007 (the "*Effective Date*"), by and between Dark Hall, LLC (the "*Company*"), on the one hand, and Boston Entertainment Partner ("*Investor*"), on the other hand.

1   Picture Specifications.

    (a)   Producers. Matthew Arnold. Michael Costner.

    (b)   Executive Producers. Sun-Sophia Yoo

    (c)   Screenplay. Matthew Arnold.

    (d)   Director. Matthew Arnold.

    (e)   Budget. U.S. $4,300,000.

2   Conditions Precedent.

    (a)   Investor's receipt and good faith approval of all chain of title documentation;

    (b)   Investor's receipt and good faith approval of the budget.

3   Production Structure and Financing. The production is structured for full financing to be from equity investors and for all of the equity investors, including Investor, to contribute 100% of the budget for the Picture against worldwide revenues. Each investor in the equity pool shall recoup its investment and shall also have a proportional right to a share in fifty percent (50%) of the net proceeds, pro-rata in the amount of each investor's investment relative to the total amount of the investments from all of the private equity investors, all as more fully set forth in Exhibit A.

4   Investment Commitment. Investor hereby agrees to provide Company with 1.5 Billion Korean Won ( ___ Million $ ___ 00,000) in production financing for the Picture (the "*Investor Contribution*"), which Investor Contribution shall be paid by Investor to Company in cash, or wire-transfer of immediately available funds to an account designated by Company. Upon execution of this Agreement and fulfillment of the Conditions Precedent, Investor shall provide $ ___ ,000 of the Investor Contribution in cash or wire transfer of immediately available funds to the production account which can be used immediately in connection with the pre-production of the Picture. The balance of the Investor Contribution shall be paid by Investor to Company in immediately available cash, or in wire transfer of immediately available funds, to the production account for the Picture, such funds to be sent no later than June 1st, 2007. The Investor Contribution shall be used solely in connection with the production of the Picture.

5   Investor Return. As consideration for the Investor Contribution, Investor shall be entitled to receive the following sums out of Gross Receipts:

1

Ex 12

    (a)    Investor's share of Gross Receipts payable pursuant to Paragraph A(3) of Exhibit A attached hereto;

    (b)    Investor's share of Gross Receipts payable pursuant to Paragraph A(5) of Exhibit A attached hereto.

All payments made to Investor pursuant to this Paragraph 5, if any, shall be accompanied by statements setting forth an accounting of the distribution of Gross Receipts to Investor.

<u>Reporting Obligations.</u>

    (c)    <u>Accounting.</u>  Except as otherwise may be provided in the collection agreement, for the first eighteen (18) months after the initial release of the Picture, Company shall account to Investor at the addresses set forth in Paragraph 13 regarding notices, in quarterly accounting periods within sixty (60) days after the end of each such quarterly accounting period; and thereafter Company shall account semi-annually within sixty (60) days after the end of the semi-annual accounting period. Each accounting shall include (a) a statement showing, in U.S. dollars, the computation of Investor's share of Gross Receipts for such accounting period, and (b) payment for Investor's share of such Gross Receipts shown to be due, if any. Statements may be changed from time to time to correct errors. Any withholding or deduction required by law may be made. All amounts shown as due to Investor shall accompany such statements.

    (d)    <u>Production Reports.</u>  During all phases of production of the Picture, Company shall keep Investor informed as to the progress of production of the Picture and provide Investor with copies of the weekly cost reports.

6    <u>Audit Rights.</u>

    (a)    Investor may, at its own expense, audit and make copies of Company's applicable books and records relating to the Picture in order to verify statements rendered hereunder. Any such audit shall only be conducted during a period not to exceed sixty (60) days by a firm of certified public accountants with expertise in the motion picture industry during reasonable business hours at Company's offices, in the United States, so as not to unreasonably interfere with Company's normal business activities. A true copy of any report(s) furnished to Investor by such firm of accountants shall concurrently be furnished to Company. If the result of any audit indicates an underpayment by Company of ten percent (10%) or more, the costs associated with that specific audit shall be borne by Company.

    (b)    In no event shall any audit occur more than once per calendar year or continue longer than a reasonable period of time.

7    <u>Credit.</u>

    (a)    Investor shall be accorded credit in connection with the Picture as follows:

    (i)    <u>Presentation Credit:</u>  On screen, on a single card (and at Company's discretion, shared with other production companies in connection with the Picture), in substantially the form of "In Association with KTF" in the main titles (i.e., where the individual

LA 128735171v2 101456.010000

2

credits for the principal cast and the "directed by" credit appear, whether located at the beginning or end of the Picture), with the size of type used to display the name not less than the size of type used for any other presentation credit in connection with the Picture.

(b)     All other aspects of Investor's credit shall be within Company's sole discretion. Company will contractually obligate all third parties to comply with the credit provisions hereunder; provided, however, that no casual or inadvertent failure by Company to comply with the provisions of this paragraph nor any failure by third parties to comply with their agreements with Company shall constitute a breach of this Agreement by Company nor entitle Investor to any relief at law or in equity. Company shall use reasonable efforts to cure any alleged failure to comply with the provisions of this Paragraph 8 prospectively where commercially practicable (i.e., with respect to positive prints not yet struck or paid advertising not yet placed) upon receipt of written notice from Investor of any such alleged failure provided that said notice specifies the details thereof.

8     Indemnification.

(a)     Investor shall defend, indemnify and hold Company, its licensees and assigns, and the directors, officers, employees and agents of the foregoing, harmless from third party claims, liabilities, damages, costs and reasonable outside legal fees (collectively, "Claims") arising from any breach by Investor of any representation, warranty or agreement made by Investor hereunder.

(b)     Subject to Investor's indemnification obligations set forth above, Company shall defend, indemnify and hold Investor and its officers, employees and affiliated entities harmless from all Claims arising from any breach or claim of breach of Company's representations, warranties or agreements hereunder or from any claim arising out of or in any way related to Company's development, production, distribution and/or exploitation of the Picture and/or any element thereof.

9     Screenings; Premiere.  Company shall invite, and/or shall use best efforts to cause any distributor of the Picture to invite, Investor and Investor's companion to attend (a) all screenings of the Picture prior to its general theatrical release, and (b) all United States premieres of the Picture, if any.  An inadvertent failure by Company or any distributor, as applicable, to comply with the foregoing shall not constitute a breach of this Agreement.  If any other Investor is provided with transportation and accommodations in connection with attending such screenings or premieres, Investor shall similarly be provided with transportation and accommodations on a most favored nations basis.

10     Representations and Warranties.

(a)     Company hereby represents and warrants as follows:

(i)     Company is a limited liability company duly formed and validly subsisting pursuant to the laws of its jurisdiction of incorporation and has the full corporate right, power and authority to enter into and perform its obligations hereunder.

(ii)     There is no matter, litigation, tax claim, proceeding or dispute pending or threatened against or affecting Company or its property, the adverse determination of which

3

might materially and adversely affect Company's financial condition or operations or impair Company's ability to perform its obligations hereunder.

(iii)     The execution and delivery of this Agreement does not, and the performance by Company of its obligations under this Agreement will not contravene any laws, regulations or by-laws applicable thereto and all consents, licenses, approval authorizations or exemptions of any governmental body or regulatory authority required or advisable for or in connection with the execution, delivery and performance of Company hereunder have been obtained and are in full force and effect.

(iv)     The execution, delivery and performance by Company of this Agreement will not contravene any agreement, contract or other instrument to which it is a party or by which it or its property may be bound.

(v)     The Picture and each and every element thereof (i) shall not violate or infringe upon the trademark, trade name, copyright, patent, or other intellectual property, or (ii) to the best of Company's knowledge, information and belief, shall not violate or infringe upon any personal, civil or proprietary right, right of privacy or publicity, moral right of authors or any other right of any person and shall not constitute a defamation of any person.

All music shall be cleared on a worldwide basis or owned and controlled by Company on a worldwide basis in perpetuity, subject only to the performing rights societies.

(vi)     Company has good, valid and marketable title to all rights required in order to produce, distribute and generally exploit the Picture, free and clear of all mortgages, liens, claims, encumbrances or charges of any nature. Company shall not cause, inadvertently or otherwise, there to be any claims, liens or other encumbrances or rights of any nature in and to the Picture and any elements thereof which will in any way interfere with or impair any of the rights in the Picture or granted to Investor pursuant to the terms of this Agreement or otherwise, with the exception of liens granted by Company to any investor in connection with an investment. Company has not sold, assigned, transferred or conveyed and will not sell, assign, transfer or convey to any person any right, title or interest in and to the Picture or any element thereof, except as expressly permitted hereunder.

(vii)     Company's only business shall be the production and distribution of the Picture.

(b)     Investor hereby represents and warrants as follows:

(i)     Investor is an individual or a private company limited by shares duly incorporated and validly subsisting pursuant to the laws of Korea and has the full corporate right, power and authority to enter into and perform its obligations hereunder.

(ii)     There is no matter, litigation, tax claim, proceeding or dispute pending or threatened against or affecting Investor or its property, the adverse determination of which might materially and adversely affect Investor's financial condition or operations or impair Investor's ability to perform its obligations hereunder.

LA 126735171v2 101456.010000

4

(iii)   The execution, delivery and performance by Investor of this Agreement will not contravene any agreement, contract or other instrument to which it is a party or by which it or its property may be bound.

11   Insurance.   Company shall cause Investor to be named as an additional insured and covered under Company's policies of General Liability and Errors and Omissions Insurance with respect to the Picture, in accordance with the terms and subject to the conditions and limitations of such policies.

12   Assignment.   Investor may not transfer its liabilities or obligations or requirements hereunder; provided, however, that Investor may transfer Investor's right to any revenues or proceeds, if any, as set forth herein, to any person, firm or corporation, without limitation. Company shall not have the right to assign this Agreement, nor any rights and obligations in connection therewith.

13   Notices.   Any notice, request, claim or other communication required or necessary to comply with the terms hereunder shall be in writing and be deemed to have been duly given if delivered by hand, regular mail or if sent by certified mail, postage and certification prepaid, or if by facsimile with evidence of transmission (followed by a hard copy), to the party at the address listed on the signature page hereto, or to such other address or addresses as either party may have furnished to the other in writing in accordance herewith.

14   Compliance with Securities Laws.   Company hereby acknowledges and agrees that Investor is committing to provide production financing (recourse only to the revenue stream of the Picture to Company for the Picture. Nonetheless, in the event this Agreement is construed as a security, the parties acknowledge and agree that this Agreement is expressly conditioned on full compliance by all parties with all applicable state and federal securities laws and that Company has not solicited or offered for sale any securities to Investor, nor provided any documents which are intended or shall be construed as solicitations, advertisements and/or offers for sale, and that should this Agreement be construed as a security, that the parties intend to rely on exemptions from qualification under California securities laws and exemptions from registration under federal securities laws. Investor has been advised to seek independent legal counsel before making this commitment and fully understands, and can withstand, that there is a high risk of loss associated with making the Investor Contribution to Company, that the Picture may generate insufficient revenues to repay all or part of the Investor Contribution, and that Investor will provide the Investor Contribution to Company, as part of the cash budget, for the production of the Picture. Investor acknowledges that no assurances, guaranties, representations or warranties have been given that, if all of the production financing is provided to Company and the Picture is produced, any recoupment and/or Gross Receipts, and/or Investor's portion of Gross Receipts will be realized, and that Investor is not relying and has not relied on any statements, representations or warranties of any person or entity in making the decision to provide the Investor Contribution to Company. Investor is sophisticated in investment and business matters and is knowingly, voluntarily and intelligently agreeing to provide the Investor Contribution. Principals of Company may also serve in other roles regarding the Picture (e.g., individual producer, writer, director, etc.) and Investor consents to any conflict of interest resulting from relationships and interests with respect to the Picture.

5

15    Status of Parties.    Company, on the one hand, and Investor, on the other hand, are independent contractors with respect to each other. Nothing herein shall create any association, partnership, joint venture or agency relationship between the parties.

16    Investor's Remedies.    In the event of breach of this Agreement by Company or in the event of any dispute with Company regarding this Agreement, Investor's remedies shall be limited to seek damages at law subject to the limitations set forth herein and in no event shall Investor seek injunctive relief against Company and/or the Picture.

17    Arbitration.    Any and all controversies, claims or disputes arriving out of or related to the Agreement or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of state or federal statutory or common law rights or duties, and the determination of the scope or applicability of the Agreement to arbitrate ("Dispute"), shall be resolved according to the following procedures, which shall constitute the sole dispute resolution mechanism hereunder:  If Company and Investor are unable to resolve any Dispute informally, then such Dispute shall be submitted to final and binding arbitration.  The arbitration shall be initiated and conducted according to either the JAMS Streamlined (for claims under $250,000) or the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures, except as modified herein, including the Optional Appeal Procedure, at the Los Angeles offices of JAMS, or its successor ("JAMS") in effect at the time the request for arbitration is made (the "Arbitration Rules").  The arbitration shall be conducted in Los Angeles, California before a panel of three arbitrators (the "Panel"), one of whom shall be selected by Investor, one of whom shall be selected by Company and the third of whom (who shall chair the Panel) shall be selected by the two arbitrators so selected.  The Panel shall follow California law and Federal Rules of Evidence in adjudicating the Dispute, and discovery shall be permitted to the extent permitted under California law.  The parties waive the right to seek punitive damages and the Panel shall have no authority to award such damages.  The Panel will provide a detailed written statement of decision, which will be part of the arbitration award and admissible in any judicial proceeding to confirm, correct or vacate the award.  Unless Company and Investor agree otherwise, the Panel and the members of any appeal panel shall be former or retired judges or justices of any California state or federal court with experience in matters involving the entertainment industry.  If either party refuses to perform any or all of its obligations under the final arbitration award (following appeal, if applicable) within thirty (30) days of such award being rendered, then the other party may enforce the final award in any court of competent jurisdiction.  The party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, incurred in enforcing the award, to be paid by the party against whom enforcement is ordered.  Any Dispute or portion thereof, or any claim for a particular form of relief (not otherwise precluded by any other provision of the Agreement), that may not be arbitrated pursuant to applicable state or federal law may be heard only in a court of competent jurisdiction in Los Angeles, California.

18    Attorneys' Fees.    If any legal action, arbitration or other proceeding is brought for the enforcement of this Agreement, or because of any dispute, alleged breach, default or misrepresentation in connection with this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs that it incurred in that action, arbitration or other proceeding, in addition to any other relief to which it may be entitled.  No

LA 1287351710/3 101456.010800

part of any cost or fee described in this Paragraph 19 shall be factored into the calculation of Gross Receipts required to be paid to Investor hereunder.

19      Governing Law and Venue.   This Agreement is to be governed and construed in accordance with the laws of the State of California applicable to contracts made and to be performed wholly within such state, and without regard to the conflict of laws principles thereof. A suit brought hereon shall be brought in the state or federal court sitting in Los Angeles, California, and the parties hereto hereby waive any claim or defense that such forum is not convenient or proper. Each party hereby agrees that any such court shall have *an personam* jurisdiction over it and consents to service of process in any manner authorized by California law.

20      General.   Captions appearing at the commencement of the paragraphs hereof are descriptive only and are for convenience and shall not be construed as part of this document. Each provision of this Agreement performable by either party hereto shall be deemed both a covenant and a condition. This Agreement is to be deemed to have been prepared jointly by the parties hereto and if any inconsistencies or ambiguities exist herein, it shall not be interpreted or construed against any party as the drafter. All of the terms and provisions contained herein shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, successors and assigns. This Agreement may be executed in any number of counterparts, by manual or facsimile signatures, each of which will be an original, but all of which together will constitute one and the same agreement.

21      Videocassette/DVD.   When videocassettes and DVDs of the Picture are commercially available for release to the general public, Company shall provide to Investor two (2) DVD or VHS copies of the Picture without charge for Investor's personal use only.

22      Collection Agreement.   Company shall enter into a collection agreement with respect to the Picture for purposes of collecting and distributing Gross Receipts. Investor shall be made a party to such collection agreement.

23      Entire Agreement.   This Agreement shall supersede any oral or prior written agreements between Investor and Company, and shall not be modified or amended except by a document in writing signed by both the parties. Unless and until this Agreement is modified or amended by the parties hereto in writing, if ever, this Agreement shall be binding upon the parties.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date noted above.

Dark Hall Productions LLC ("Company")          Boston Entertainment Partner ("Investor")

By: _____                    By: _____
Name: _____                    Name: _____
Title: _____                    Title: _____
Address: _____                    Address: _____
_____

LA 125736171v2 101486.010000

7

## EXHIBIT A

A.    Allocation of Gross Receipts.  All Gross Receipts shall be allocated as follows:

(1)    First, any so-called customary "off-the-tops" (i.e., sales, use, receipts, value added, withholding and other remittance taxes however denominated, residual and supplemental market payments, collection of film rentals, expenses of transmitting to U.S. any funds from foreign countries, dues and assessments to trade associations) for which Company is responsible for payment and actually pays, including, but not limited to, residual payments;

(2)    Second, Company shall deduct all direct, third-party, out-of-pocket distribution, marketing and sales agency expenses actually paid in connection with the Picture, plus the cost of any delivery items not budgeted or, in the alternative, budgeted but not delivered plus actual interest thereon;

(3)    Third, Investor shall be paid on a pro-rata basis based on other equity investors' contributions one hundred percent (100%) of the Investor Contribution;

(4)    Fourth, all deferments, if any, or bonuses, if any, payable in connection with the Picture;

(5)    Fifth, all remaining Gross Receipts shall be payable fifty percent (50%) to Company and fifty percent (50%) to all equity investors, including Investor, on a pro-rata basis based on the other equity investors' contributions including the Investor Contribution.  Any third party participations (Contingent Compensation) shall be deducted from Company's share of Gross Receipts.

(B)    Gross Receipts shall be defined as all sums actually received by (and earned or non-returnable) or credited to, or on behalf of, Company, its subsidiaries and affiliated entities, resulting from the distribution or other exploitation of the Picture and all rights therein throughout the world in perpetuity.

LA 125735171v2 101498.010000

6

## INVESTMENT AGREEMENT

THIS INVESTMENT AGREEMENT (the "*Agreement*"), entered into in connection with the motion picture tentatively entitled *The Door* (the "*Picture*"), is made as of this ___th day of _____, 2007 (the "*Effective Date*"), by and between Dark Hall, LLC (the "*Company*"), on the one hand, and __Korea Business News__ ("*Investor*"), on the other hand.

1    Picture Specifications.

   (a)    Producers.  Matthew Arnold.  Michael Costner.

   (b)    Executive Producers.  Sun-Sophia Yoo

   (c)    Screenplay.  Matthew Arnold.

   (d)    Director.  Matthew Arnold.

   (e)    Budget.  U.S. $4,500,000.

2    Conditions Precedent.

   (a)    Investor's receipt and good faith approval of all chain of title documentation;

   (b)    Investor's receipt and good faith approval of the budget.

3    Production Structure and Financing.  The production is structured for full financing to be from equity investors and for all of the equity investors, including Investor, to contribute 100% of the budget for the Picture against worldwide revenues.  Each investor in the equity pool shall recoup its investment and shall also have a proportional right to a share in fifty percent (50%) of the net proceeds, pro-rata in the amount of each investor's investment relative to the total amount of the investments from all of the private equity investors, all as more fully set forth in Exhibit A.

4    Investment Commitment.  Investor hereby agrees to provide Company with 1(one) Billion Korean Won (        Million $        00,000) in production financing for the Picture (the "*Investor  Contribution*"), which Investor Contribution shall be paid by Investor to Company in cash, or wire-transfer of immediately available funds to an account designated by Company.  Upon execution of this Agreement and fulfillment of the Conditions Precedent, Investor shall provide  $        ,000 of the Investor Contribution in cash or wire transfer of immediately available funds to the production account which can be used immediately in connection with the pre-production of the Picture.  The balance of the Investor Contribution shall be paid by Investor to Company in immediately available cash, or in wire transfer of immediately available funds, to the production account for the Picture, such funds to be sent no later than June 1st, 2007.  The Investor Contribution shall be used solely in connection with the production of the Picture.

5    Investor Return.  As consideration for the Investor Contribution, Investor shall be entitled to receive the following sums out of Gross Receipts:

LA 12673517v2 101468.010009

1

(a)   Investor's share of Gross Receipts payable pursuant to Paragraph A(3) of Exhibit A attached hereto;

(b)   Investor's share of Gross Receipts payable pursuant to Paragraph A(5) of Exhibit A attached hereto.

All payments made to Investor pursuant to this Paragraph 5, if any, shall be accompanied by statements setting forth an accounting of the distribution of Gross Receipts to Investor.

<u>Reporting Obligations.</u>

(c)   <u>Accounting.</u>   Except as otherwise may be provided in the collection agreement, for the first eighteen (18) months after the initial release of the Picture, Company shall account to Investor at the addresses set forth in Paragraph 13 regarding notices, in quarterly accounting periods within sixty (60) days after the end of each such quarterly accounting period; and thereafter Company shall account semi-annually within sixty (60) days after the end of the semi-annual accounting period. Each accounting shall include (a) a statement showing, in U.S. dollars, the computation of Investor's share of Gross Receipts for such accounting period, and (b) payment for Investor's share of such Gross Receipts shown to be due, if any. Statements may be changed from time to time to correct errors. Any withholding or deduction required by law may be made. All amounts shown as due to Investor shall accompany such statements.

(d)   <u>Production Reports.</u>   During all phases of production of the Picture, Company shall keep Investor informed as to the progress of production of the Picture and provide Investor with copies of the weekly cost reports.

6    <u>Audit Rights.</u>

(a)   Investor may, at its own expense, audit and make copies of Company's applicable books and records relating to the Picture in order to verify statements rendered hereunder. Any such audit shall only be conducted during a period not to exceed sixty (60) days by a firm of certified public accountants with expertise in the motion picture industry during reasonable business hours at Company's offices, in the United States, so as not to unreasonably interfere with Company's normal business activities. A true copy of any report(s) furnished to Investor by such firm of accountants shall concurrently be furnished to Company. If the result of any audit indicates an underpayment by Company of ten percent (10%) or more, the costs associated with that specific audit shall be borne by Company.

(b)   In no event shall any audit occur more than once per calendar year or continue longer than a reasonable period of time.

7    <u>Credit.</u>

(a)   Investor shall be accorded credit in connection with the Picture as follows:

(i)   <u>Presentation Credit:</u>   On screen, on a single card (and at Company's discretion, shared with other production companies in connection with the Picture), in substantially the form of "In Association with _____" in the main titles (i.e., where the

LA 12573517v2 101456.010000

2



individual credits for the principal cast and the "directed by" credit appear, whether located at the beginning or end of the Picture), with the size of type used to display the name not less than the size of type used for any other presentation credit in connection with the Picture.

(b)   All other aspects of Investor's credit shall be within Company's sole discretion. Company will contractually obligate all third parties to comply with the credit provisions hereunder; provided, however, that no casual or inadvertent failure by Company to comply with the provisions of this paragraph nor any failure by third parties to comply with their agreements with Company shall constitute a breach of this Agreement by Company nor entitle Investor to any relief at law or in equity. Company shall use reasonable efforts to cure any alleged failure to comply with the provisions of this Paragraph 8 prospectively where commercially practicable (i.e., with respect to positive prints not yet struck or paid advertising not yet placed) upon receipt of written notice from Investor of any such alleged failure provided that said notice specifies the details thereof.

8      Indemnification.

(a)   Investor shall defend, indemnify and hold Company, its licensees and assigns, and the directors, officers, employees and agents of the foregoing, harmless from third party claims, liabilities, damages, costs and reasonable outside legal fees (collectively, "Claims") arising from any breach by Investor of any representation, warranty or agreement made by Investor hereunder.

(b)   Subject to Investor's indemnification obligations set forth above, Company shall defend, indemnify and hold Investor and its officers, employees and affiliated entities harmless from all Claims arising from any breach or claim of breach of Company's representations, warranties or agreements hereunder or from any claim arising out of or in any way related to Company's development, production, distribution and/or exploitation of the Picture and/or any element thereof.

9      Screenings; Premiere.   Company shall invite, and/or shall use best efforts to cause any distributor of the Picture to invite, Investor and Investor's companion to attend (a) all screenings of the Picture prior to its general theatrical release, and (b) all United States premieres of the Picture, if any.   An inadvertent failure by Company or any distributor, as applicable, to comply with the foregoing shall not constitute a breach of this Agreement.   If any other Investor is provided with transportation and accommodations in connection with attending such screenings or premieres, Investor shall similarly be provided with transportation and accommodations on a most favored nations basis.

10     Representations and Warranties.

(a)   Company hereby represents and warrants as follows:

(i)    Company is a limited liability company duly formed and validly subsisting pursuant to the laws of its jurisdiction of incorporation and has the full corporate right, power and authority to enter into and perform its obligations hereunder.

(ii)   There is no matter, litigation, tax claim, proceeding or dispute pending or threatened against or affecting Company or its property, the adverse determination of which

LA 126735171v2 101456.010000

3

might materially and adversely affect Company's financial condition or operations or impair Company's ability to perform its obligations hereunder.

       (iii)    The execution and delivery of this Agreement does not, and the performance by Company of its obligations under this Agreement will not contravene any laws, regulations or by-laws applicable thereto and all consents, licenses, approval authorizations or exemptions of any governmental body or regulatory authority required or advisable for or in connection with the execution, delivery and performance of Company hereunder have been obtained and are in full force and effect.

       (iv)    The execution, delivery and performance by Company of this Agreement will not contravene any agreement, contract or other instrument to which it is a party or by which it or its property may be bound.

       (v)    The Picture and each and every element thereof (i) shall not violate or infringe upon the trademark, trade name, copyright, patent, or other intellectual property, or (ii) to the best of Company's knowledge, information and belief, shall not violate or infringe upon any personal, civil or proprietary right, right of privacy or publicity, moral right of authors or any other right of any person and shall not constitute a defamation of any person.

       All music shall be cleared on a worldwide basis or owned and controlled by Company on a worldwide basis in perpetuity, subject only to the performing rights societies.

       (vi)    Company has good, valid and marketable title to all rights required in order to produce, distribute and generally exploit the Picture, free and clear of all mortgages, liens, claims, encumbrances or charges of any nature. Company shall not cause, inadvertently or otherwise, there to be any claims, liens or other encumbrances or rights of any nature in and to the Picture and any elements thereof which will in any way interfere with or impair any of the rights in the Picture or granted to Investor pursuant to the terms of this Agreement or otherwise, with the exception of liens granted by Company to any investor in connection with an investment. Company has not sold, assigned, transferred or conveyed and will not sell, assign, transfer or convey to any person any right, title or interest in and to the Picture or any element thereof, except as expressly permitted hereunder.

       (vii)    Company's only business shall be the production and distribution of the Picture.

      (b)    Investor hereby represents and warrants as follows:

       (i)    Investor is an individual or a private company limited by shares duly incorporated and validly subsisting pursuant to the laws of Korea and has the full corporate right, power and authority to enter into and perform its obligations hereunder.

       (ii)    There is no matter, litigation, tax claim, proceeding or dispute pending or threatened against or affecting Investor or its property, the adverse determination of which might materially and adversely affect Investor's financial condition or operations or impair Investor's ability to perform its obligations hereunder.

4

LA 126735771v2 101468.010080

(iii)   The execution, delivery and performance by Investor of this Agreement will not contravene any agreement, contract or other instrument to which it is a party or by which it or its property may be bound.

11    Insurance.   Company shall cause Investor to be named as an additional insured and covered under Company's policies of General Liability and Errors and Omissions Insurance with respect to the Picture, in accordance with the terms and subject to the conditions and limitations of such policies.

12    Assignment.   Investor may not transfer its liabilities or obligations or requirements hereunder; provided, however, that Investor may transfer Investor's right to any revenues or proceeds, if any, as set forth herein, to any person, firm or corporation, without limitation. Company shall not have the right to assign this Agreement, nor any rights and obligations in connection therewith.

13    Notices.   Any notice, request, claim or other communication required or necessary to comply with the terms hereunder shall be in writing and be deemed to have been duly given if delivered by hand, regular mail or if sent by certified mail, postage and certification prepaid, or if by facsimile with evidence of transmission (followed by a hard copy), to the party at the address listed on the signature page hereto, or to such other address or addresses as either party may have furnished to the other in writing in accordance herewith.

14    Compliance with Securities Laws.   Company hereby acknowledges and agrees that Investor is committing to provide production financing (recourse only to the revenue stream of the Picture to Company for the Picture. Nonetheless, in the event this Agreement is construed as a security, the parties acknowledge and agree that this Agreement is expressly conditioned on full compliance by all parties with all applicable state and federal securities laws and that Company has not solicited or offered for sale any securities to Investor, nor provided any documents which are intended or shall be construed as solicitations, advertisements and/or offers for sale, and that should this Agreement be construed as a security, that the parties intend to rely on exemptions from qualification under California securities laws and exemptions from registration under federal securities laws.. Investor has been advised to seek independent legal counsel before making this commitment and fully understands, and can withstand, that there is a high risk of loss associated with making the Investor Contribution to Company, that the Picture may generate insufficient revenues to repay all or part of the Investor Contribution, and that Investor will provide the Investor Contribution to Company, as part of the cash budget, for the production of the Picture. Investor acknowledges that no assurances, guaranties, representations or warranties have been given that, if all of the production financing is provided to Company and the Picture is produced, any recoupment and/or Gross Receipts, and/or Investor's portion of Gross Receipts will be realized, and that Investor is not relying and has not relied on any statements, representations or warranties of any person or entity in making the decision to provide the Investor Contribution to Company. Investor is sophisticated in investment and business matters and is knowingly, voluntarily and intelligently agreeing to provide the Investor Contribution. Principals of Company may also serve in other roles regarding the Picture (e.g., individual producer, writer, director, etc.) and Investor consents to any conflict of interest resulting from relationships and interests with respect to the Picture.

5

15   Status of Parties.  Company, on the one hand, and Investor, on the other hand, are independent contractors with respect to each other.  Nothing herein shall create any association, partnership, joint venture or agency relationship between the parties.

16   Investor's Remedies.  In the event of breach of this Agreement by Company or in the event of any dispute with Company regarding this Agreement, Investor's remedies shall be limited to seek damages at law subject to the limitations set forth herein and in no event shall Investor seek injunctive relief against Company and/or the Picture.

17   Arbitration.  Any and all controversies, claims or disputes arriving out of or related to the Agreement or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of state or federal statutory or common law rights or duties, and the determination of the scope or applicability of the Agreement to arbitrate ("Dispute"), shall be resolved according to the following procedures, which shall constitute the sole dispute resolution mechanism hereunder:  If Company and Investor are unable to resolve any Dispute informally, then such Dispute shall be submitted to final and binding arbitration.  The arbitration shall be initiated and conducted according to either the JAMS Streamlined (for claims under $250,000) or the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures, except as modified herein, including the Optional Appeal Procedure, at the Los Angeles offices of JAMS, or its successor ("JAMS") in effect at the time the request for arbitration is made (the "Arbitration Rules").  The arbitration shall be conducted in Los Angeles, California before a panel of three arbitrators (the "Panel"), one of whom shall be selected by Investor, one of whom shall be selected by Company and the third of whom (who shall chair the Panel) shall be selected by the two arbitrators so selected.  The Panel shall follow California law and Federal Rules of Evidence in adjudicating the Dispute, and discovery shall be permitted to the extent permitted under California law.  The parties waive the right to seek punitive damages and the Panel shall have no authority to award such damages.  The Panel will provide a detailed written statement of decision, which will be part of the arbitration award and admissible in any judicial proceeding to confirm, correct or vacate the award.  Unless Company and Investor agree otherwise, the Panel and the members of any appeal panel shall be former or retired judges or justices of any California state or federal court with experience in matters involving the entertainment industry.  If either party refuses to perform any or all of its obligations under the final arbitration award (following appeal, if applicable) within thirty (30) days of such award being rendered, then the other party may enforce the final award in any court of competent jurisdiction.  The party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, incurred in enforcing the award, to be paid by the party against whom enforcement is ordered.  Any Dispute or portion thereof, or any claim for a particular form of relief (not otherwise precluded by any other provision of the Agreement), that may not be arbitrated pursuant to applicable state or federal law may be heard only in a court of competent jurisdiction in Los Angeles, California.

18   Attorneys' Fees.  If any legal action, arbitration or other proceeding is brought for the enforcement of this Agreement, or because of any dispute, alleged breach, default or misrepresentation in connection with this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs that it incurred in that action, arbitration or other proceeding, in addition to any other relief to which it may be entitled.  No

6

part of any cost or fee described in this Paragraph 19 shall be factored into the calculation of Gross Receipts required to be paid to Investor hereunder.

19    Governing Law and Venue.   This Agreement is to be governed and construed in accordance with the laws of the State of California applicable to contracts made and to be performed wholly within such state, and without regard to the conflict of laws principles thereof. A suit brought hereon shall be brought in the state or federal court sitting in Los Angeles, California, and the parties hereto hereby waive any claim or defense that such forum is not convenient or proper.   Each party hereby agrees that any such court shall have *an personam* jurisdiction over it and consents to service of process in any manner authorized by California law.

20    General.   Captions appearing at the commencement of the paragraphs hereof are descriptive only and are for convenience and shall not be construed as part of this document. Each provision of this Agreement performable by either party hereto shall be deemed both a covenant and a condition.  This Agreement is to be deemed to have been prepared jointly by the parties hereto and if any inconsistencies or ambiguities exist herein, it shall not be interpreted or construed against any party as the drafter.  All of the terms and provisions contained herein shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, successors and assigns.  This Agreement may be executed in any number of counterparts, by manual or facsimile signatures, each of which will be an original, but all of which together will constitute one and the same agreement.

21    Videocassette/DVD.   When videocassettes and DVDs of the Picture are commercially available for release to the general public, Company shall provide to Investor two (2) DVD or VHS copies of the Picture without charge for Investor's personal use only.

22    Collection Agreement.   Company shall enter into a collection agreement with respect to the Picture for purposes of collecting and distributing Gross Receipts, Investor shall be made a party to such collection agreement.

23    Entire Agreement.   This Agreement shall supersede any oral or prior written agreements between Investor and Company, and shall not be modified or amended except by a document in writing signed by both the parties.  Unless and until this Agreement is modified or amended by the parties hereto in writing, if ever, this Agreement shall be binding upon the parties.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date noted above.

Dark Hall Productions LLC ("Company")          Korea Business Ness co.,ltd  ("Investor")

By: _____                 By: _____
Name: MATTHEW _____ Yu;               Name: _____
Title: DULE CTLL EXECUTIVE _____            Title: _____
Address:  1453 4th St. #409                   Address:  94-46 Youngdungpo 7 Ave
_____ Santa Monica, CA 90401 USA            _____ Youngdungpo-Gu, Seoul KOREA

LA 126735171v2 101455.010000                  7

 

## EXHIBIT A

A.   **Allocation of Gross Receipts.**  All Gross Receipts shall be allocated as follows:

(1)   First, any so-called customary "off-the-tops" (i.e., sales, use, receipts, value added, withholding and other remittance taxes however denominated, residual and supplemental market payments, collection of film rentals, expenses of transmitting to U.S. any funds from foreign countries, dues and assessments to trade associations) for which Company is responsible for payment and actually pays, including, but not limited to, residual payments;

(2)   Second, Company shall deduct all direct, third-party, out-of-pocket distribution, marketing and sales agency expenses actually paid in connection with the Picture, plus the cost of any delivery items not budgeted or, in the alternative, budgeted but not delivered plus actual interest thereon;

(3)   Third, Investor shall be paid on a pro-rata basis based on other equity investors' contributions one hundred percent (100%) of the Investor Contribution;

(4)   Fourth, all deferments, if any, or bonuses, if any, payable in connection with the Picture;

(5)   Fifth, all remaining Gross Receipts shall be payable fifty percent (50%) to Company and fifty percent (50%) to all equity investors, including Investor, on a pro-rata basis based on the other equity investors' contributions including the Investor Contribution.  Any third party participations (Contingent Compensation) shall be deducted from Company's share of Gross Receipts.

(B)   Gross Receipts shall be defined as all sums actually received by (and earned or non-returnable) or credited to, or on behalf of, Company, its subsidiaries and affiliated entities, resulting from the distribution or other exploitation of the Picture and all rights therein throughout the world in perpetuity.

8

# ATTACHMENT 3

 

Osborne, Lynne (Para-LA-Ent)

| | |
|---|---|
| From: | Matt Arnold [1900matt@gmail.com] |
| Sent: | Monday, July 16, 2007 1:13 PM |
| To: | Paul, Randolph M. (Shld-LA-Ent) |
| Subject: | Urgent |

-------- Forwarded Message
From: entesquire@aol.com
Reply-To: entesquire@aol.com
Date: Mon, 16 Jul 2007 19:58:59 +0000
To: 1900matt@gmail.com, paulr@gtlaw.com
Cc: sophiay72@yahoo.co.kr, mshinlaw@aim.com, "Arati Misro"
<arati.tulchinent@yahoo.com>, "Jennifer Kansco"
<jkancso.tulchinent@yahoo.com>
Subject: Sophia Yoo/Matt Arnold

Mr. Matt Arnold
C/O Randy Paul, Esq.
Greenberg Traurig, LLP
2450 Colorado
Ave., Suite 400E
Santa Monica, CA 90404

Dear Matt and Randy:

I am
writing to advise you that our firm has been retained by Sophia Yoo and her group of investors
concerning a motion picture project in which my clients had been solicited to invest
approximately $ US 3.7 million dollars in a film to be directed by Matt Arnold.

Since I am currently in Europe and I
am still investigating all the facts, please accept my apologies in advance, if some of the
following is not accurate, but I do believe it is.

I am
advised that while investment agreements have not been fully executed and finalized,
approximately $US 2.7 million dollars of my clients' funds were prematurely transferred into an
LLC evidently controlled by Matt Arnold known as Dark Hall Production, LLC. This was done on

1

EX17

condition that Sophia would be managing all of the finance and spen...hg on this project.

It has come to
my client's attention that certain spending of my clients funds has been undertaken by Matt without the approval of Sophia. Moreover, as Randy will attest, it is the custom and pactice in the movie industry that a completion bond be in place to protect the investor's investment, insure completion, and for the primary benefit of the investors. It is also custom and practice in our industry that no money be spent on a production until all the funds necessary to finance the budget are also in the bank and the completion guarantor has issued it's bond prior to the release of any funds.

Accordingly, the spending of any funds from my clients' investment is at this time premature as well, as I am advised that not the entire budget has been deposited in the production compnay bank account at this time, nor will it be unless and until there are definitive written understandings on exactly how the money is to be spent which shall be subject to Sophia's prior written approval and a completion bond is in place.

Perhaps this has all been a misunderstanding between Matt and Sophia. We certainly hope so and hope that all of this can easily be ironed out.

However, in the meantime, I must issue this demand to cease and desist from all spending of any of my clients' funds until further notice and that any and all funds expended to Matt personally be returned to the account.
Further demand is hereby made for a complete accounting to date of all sums expended by Matt or the LLC and the specific billing purpose and invoices and receipts for said costs.

Finally, my clients would require evidence of a completion bond and would like to approve the bonder and bond documents prior to any expending of funds.

I will be in Europe until Thursday
morning, however I welcome Randy to give me a call on my cell at 310 567 9705 to explain his client's position, or simply wait until Thursday to sort things out. Remember, I am 9 hours ahead of LA time.

As you know, I am
obliged to state for the record that none of the foregoing shall be deemed a complete statement of the facts, nor an admission, nor a waiver of, or limitation on, all of my clients' rights, remedies, and defenses, both legal and equitable, all of which are hereby expressly reserved.

Kindest
regards.

2




Very truly yours,

Harris E. Tulchin
Harris Tulchin and
Associates, Ltd.
Attorneys At Law
2nd Floor
Los Angeles, CA 90064
11377 W.
Olympic Blvd.
Sent via BlackBerry from T-Mobile

---------- End of Forwarded Message

3

# ATTACHMENT 4

# Power of Attorney

Date: JULY 26, 2007

Mandatory : Korea Business News
Registration No. of Business : 107-81-70183
Address : 94-46 Youngdungpo-Dong 7 Ave Youngdungpo-Gu,
Seoul KOREA

We certify that we give our authorization to Chairman Mr. YOO to handle this circumstance, and Chairman Mr. YOO is representing us

By :
Name : KI  WOONG  KIM
Title :   C E O

D  0170

93-1

# Authorization Letter

July 27, 2007

I, Hyun Woo Kim, the CEO of Boston Investment Co., Ltd., hereby certify Chairman YOO to handle the circumstances and activities concerning the film called, *The Door*, on behalf of me and my company.

Boston Investment Co., Ltd.
13th Floor, Mihae building, 18Nonhyun-Dong
Kangnam-Gu, Seoul, Korea

CEO
Hyun Woo Kim

D  0171

94-1

# ATTACHMENT 5

```
                    ACTIVITY: PRIOR CYCLE

   Account Type: DDA    Account Number: 02186-68813      Service Chg: L1
   Account Title: SUN JEE YOO                            Date Open:
                  MATTHEW E ARNOLD                       Last Stmt:
      MSG                                                Next Stmt:    8/23/07
Display activity for:     /    Service ID: IP 4870   Prior Cycle Stmt:  8/23/07
```

| DATE | DOLLAR AMOUNT | TYPE | DESCRIPTOR | UNIT# | REF ID |
|------|---------------|------|------------|-------|--------|
| 08/22 | 1,945,000.00 | DR | TELLER XFR | MTL | 95787505589 |
|  | Account Bal: | .00 | | | |
| 08/21 | .00 | DR | CLARKE AM | CAR | 99427425880 |
|  | Account Bal: 1,945,000.00 | | | | |
| 08/01 | 1,945,000.00 | CR | | 0218 | 06560698352 |
|  | Account Bal: 1,945,000.00 | | | | |

```
                              Monday, Sep. 17, 2007        17:35:09
```

```
                   Customer Relationship Inquiry

Name: MATTHEW E ARNOLD                M/F: M  Customer ID: 1121389931
Cust Since: 07/31/2007   Type: VIP    PLUS     VIN:     TIN: 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
              Close-Up
            PRIMA ACCOUNT                       Account        C/A   Last $
Available Bal:              0.00       ACT   Type/Product     Rel  Activity
Account Bal:                0.00
Average Bal:       1,775,869.55        CIF
Status: CLOSED    Open Dt: 07/07      *DDA     02186-68813    OWN  08/22/07<-
Stor: 1  Info Rst: N
NSF Days:          Stmt: 08/23/07
Flags:              MSG  PAPR

            Summary
Avail Deposits:            0.00
Total Loan Bal:            0.00

Offer: REGULAR SAVINGS                 * - Closed
       BANK OF AMERICA ATM CARD SER    # - Divested
                                       ! - Message
```

```
                              Monday, Sep. 17, 2007        17:34:17
```

EX 28



Customer Relationship Inquiry

me: MATTHEW E ARNOLD                    M/F: M   Customer ID: 1121389931
st Since: 07/31/2007   Type: VIP    PLUS      VIN:       TIN: 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
============= Close-Up =============
Language: ENGLISH            Global: Y       ┌──────────────────────────────────┐
Birthdate:  04/08/1974                       │         Account        C/A  Last $│
WWW/PSW:    SALCE                             │ACT     Type/Product    Rel Activity│
Day Phone: (310) 927-5881                    │ CIF                               │
Eve Phone: (310) 927-5881                    │*DDA     02186-68813    OWN 08/22/07│ <--
Prim ID: DL  Issr: CA   Dt: 04/2006          │                                   │
Nbr/Des: A6887757                            │                                   │
Online:       Svc:                           │                                   │
========== Summary ==========                │                                   │
Avail Deposits:            0.00              │                                   │
Total Loan Bal:            0.00              │                                   │
                                             │                                   │
Offer: REGULAR SAVINGS                       │ * - Closed                        │
       BANK OF AMERICA ATM CARD SER          │ # - Divested                      │
                                             │ ! - Message                       │
                                             └──────────────────────────────────┘

                        Monday, Sep. 17,2007        17:32:49


=========== Customer Relationship Inquiry ===========

me: MATTHEW E ARNOLD                    M/F: M   Customer ID: 1121389931
st Since: 07/31/2007   Type: VIP    PLUS      VIN:       TIN: 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
============= Close-Up =============
     NAME OF OWNER               C/A          │         Account        C/A  Last $│
                                             │ACT     Type/Product    Rel Activity│
                                             │ CIF                               │
SUN JEE YOO                       OWN         │O*DDA    02186-68813    OWN 08/22/07│<--
MATTHEW E ARNOLD                  OWN         │                                   │

========== Summary ==========
Avail Deposits:            0.00
Total Loan Bal:            0.00

Offer: REGULAR SAVINGS                        │ * - Closed
       BANK OF AMERICA ATM CARD SER           │ # - Divested
                                              │ ! - Message

                        Monday, Sep. 17,2007        17:33:11

Exhibit A Page 46 of 117

ACCOUNT MESSAGES

Account Type: DDA    Account Number: 02186-68813         Date Open:
Account Title: SUN JEE YOO
               MATTHEW E ARNOLD

ADD A MESSAGE
  Message #:
  Free Form Message:

| MESSAGE LIST DATE | # | TEXT | DELETE |
|---|---|---|---|
| 7/07 | 200 | TWO SIGNERS MUST BE PRESENT INODER TO MAKE ANY WITHDRAWALS | |
| 7/07 | 201 | CHECKS MUST HAVE TWO SIGNATORES IN ORDER TO NEGOTIATE THEM.. | |

Monday, Sep. 17,2007        17:26:34

# ATTACHMENT 6

Timothy D. Thurman, State Bar No. 216048
TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930
Los Angeles, California 90010
(213) 384 9000; (213) 402 3262 (fax)
tim.thurman@trinlaw.com

Attorneys for Plaintiff, CHUL YOON YOO

**U.S. DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CV09-7483MMM(CWx)

| | |
|---|---|
| YOON CHUL ~~CHUL YOON~~ YOO, an individual, on behalf of himself and similarly situated investors, | CASE NO.: |
| Plaintiff, | COMPLAINT FOR: |
| v. | 1. FRAUD – INTENTIONAL MISREPRESENTATION |
| MATTHEW ARNOLD, an individual; DARK HALL PRODUCTIONS, LLC, a California limited liability company; and DOES 1-10, inclusive, | 2. BREACH OF ORAL CONTRACT |
| | 3. CONVERSION |
| | 4. NEGLIGENCE |
| Defendants. | 5. ABUSE OF PROCESS |

COMES NOW Plaintiff, CHUL YOON YOO, on behalf of himself and similarly situated investors, who herein complains and alleges as follows:

**JURISDICTION**

1.     Jurisdiction within this Court is predicated upon a diversity of

1

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930
Los Angeles, California 90010
(213) 384 9000: (213) 402 3262 (fax): tim.thurman@trinlaw.com

*ROMANS 8:1-31-39*

citizenship with the amount in controversy exceeding the sum of seventy five thousand dollars ($US75,000), pursuant to 28 U.S.C. §1332, which provides in pertinent part:

> "(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
> (1) citizens of different States;
> (2) citizens of a State and citizens or subjects of a foreign state;
> (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
> (4) a foreign state, defined in section 1603 (a) of this title, as plaintiff and citizens of a State or of different States.
> For the purposes of this section, section 1335, and section 1441, an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled."
> [emphasis added].

2.      Here, the Plaintiff is a Korean national and resides in Seoul, Korea. The Defendants are domiciled in California.   The amount in controversy exceeds $US10,000,000 (ten million U.S. dollars).

3.      Plaintiff further pleads jurisdiction pursuant to the doctrine of *pendente* jurisdiction as to various related State law causes of action.

## VENUE / PARTIES

4.      Plaintiff pleads venue within this district.   Defendants reside within said district, and are doing business within the district.

5.      Plaintiff is an individual who resides in Seoul, Korea. Plaintiff also has the power of attorney to represent the other investors, who also are from Seoul,

2

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930
Los Angeles, California 90010
(213) 384 9000: (213) 402 3262 (fax): tim.thurman@trinlaw.com

ROMANS 8:1-31-39

Korea.

6.    Plaintiff is informed and believes, and on such information and belief alleges, that Defendant, MATTHEW ARNOLD (referred to herein as "Defendants" or "ARNOLD") is, and at all times mentioned herein was, a natural person who resides in the County of Los Angeles, California.

7.    Plaintiff is informed and believes, and on such information and belief alleges, that Defendant, DARK HALL PRODUCTIONS, LLC. (referred to herein as "Defendants" or "DARK HALL") is, and at all times mentioned herein was, a limited liability company owned and operated solely by MATTHEW ARNOLD. Plaintiff further alleges that DARK HALL is the alter ego of MATTHEW ARNOLD, and that given ARNOLD's failure to properly fund DARK HALL or follow the statutory requirements for an LLC, Plaintiff is permitted to pierce the corporate veil, to the extent that DARK HALL is found liable for the actions herein.

8.    The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants designated herein as "DOES 1 through 10, inclusive", are presently unknown to Plaintiff, who therefore sues said Defendants by such fictitious names.  Said defendants are sued as principals and/or agents, servants, and employees of said principals, and all of the acts performed by them as agents, servants and employees were performed in the course and scope of their authority, agency and employment.

9.    Plaintiff is informed and believes, and on such information and belief

3
PLAINTIFF'S COMPLAINT FOR DAMAGES

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd, Suite 930
Los Angeles, California 90010
(213) 384 9000: (213) 402 3262 (fax): tim.thurman@trinlaw.com

ROMANS 8:1-31-39

1    alleges, that each of the Defendants designated herein as "DOES" is responsible in

2    some manner for the events and transactions alleged herein.  Plaintiff will seek leave

3    of the Court to amend this Complaint to show their true names and capacities when

4    the same have been ascertained.

5

6                            FACTUAL ALLEGATIONS

7

8        10.    In February or March of 2007, Defendant MATTHEW ARNOLD

9    travelled to Seoul, Korea in an effort to assist Plaintiff's daughter, Sophia Yoo, in

10   raising money for a film which ARNOLD had allegedly written and wanted to

11   direct.

12

13       11.    At the time that he travelled to Korea, ARNOLD represented to

14   Plaintiff and other investors that the film would be a feature length film, and that the

15   film would feature Kevin Costner, or Nicholas Cage, or Bruce Willis.  Based on

16   ARNOLD's representations about being able to retain A-list actors for the film,

17   Plaintiff and the other investors, verbally agreed to invest in the film.

18

19       12.    At the time that he travelled to Korea, ARNOLD also represented that

20   he was the original author of the work entitled, The Door, and that he had secured a

21   copyright with the United States Copyright Office, and that he had the requisite,

22   "chain of title" secured.  Based on these representations, Plaintiff and the other

23   investors were further led to invest in the project.  Plaintiff is informed and believes

24   that ARNOLD plagiarized the script for the film.  Furthermore, at the time that he

25

26

27

28

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930
Los Angeles, California 90010
(213) 384 9000; (213) 402 2262 (fax); tim.thurman@trinlaw.com

ROMANS 8:1-39

made these representations, ARNOLD had not secured a copyright from the USCO, and had not secured the "chain of title."

13.    At the time that he travelled to Korea, ARNOLD also agreed that Plaintiff and Plaintiff's daughter, Sophia Yoo, would represent the other Korean investors, and, finally, that ARNOLD would name Sophia Yoo as a member of ARNOLD's LLC, DARK HALL PRODUCTIONS.    Again, these were key representations that made the Korean investors, including the Plaintiff, willing to invest money in the project.

14.    During the time between May 25 and June 4, 2007, based largely on ARNOLD's representations, the Plaintiff and the investors wired a total of approximately $3,700,000 into DARK HALL's bank accounts. The oral agreement was that this money was to be used for the creation of the film, The Door, but that Sophia Yoo would have primary control over how the funds were spent.  ARNOLD also agreed orally not to move the money out of the bank account into which it was wired, and to give Sophia Yoo online access to the bank account.  On or about June 26, 2007, ARNOLD did in fact move the money out of the account into which it was wired, causing a major issue with the Korean version of the IRS.  And ARNOLD did not in fact ever give Sophia Yoo access to the bank account online.

15.    Following the large transfer of money, ARNOLD began to act differently.  He stopped virtually all communication with Sophia Yoo, who was in Korea and Japan.  This made the investor's very uncomfortable, especially given

5

that they had no signed investor agreement (another promise which ARNOLD failed to complete).

16.    On or about June 26, 2007, Sophia Yoo asked ARNOLD to send bank documents to show that the wired money had been safely and correctly deposited in DARK HALL's bank account. On or about June 28, 2007, Sophia Yoo asked ARNOLD again to send the bank statements. These bank statements were needed for the Bank of Korea and the Korean version of the Internal Revenue Service because of the large amount of money that was wired.

17.    On June 28, 2007, against the promises he had made to Sophia Yoo and to the investors, including the Plaintiff, ARNOLD travelled to Washington Mutual Bank and, against the investors' wishes and his promises, took out $20,000 to "pay his salary", $30,000 to pay a script consultant, and $5000 to pay a retainer to lawyers. The taking out of this money constituted conversion because the money still belonged to the Plaintiff and the investors (because there was no signed retainer agreement), and ARNOLD took the money out without the investors' permission. Furthermore, the removal of the money constituted fraud because ARNOLD had promised he would make no withdrawals without the consent of Sophia Yoo or the investors, including Plaintiff.

18.    Also on June 28, 2007, ARNOLD removed the money from the DARK HALL's checking account, which was the account into which the money had been wired, and into a interest bearing account. This was done in contravention to

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930
Los Angeles, California 90010
(213) 384 9000; (213) 402 3262 (fax); tim.thurman@trinlaw.com

ROMANS 8:1-31-39

6

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930
Los Angeles, California 90010
(213) 384 9000: (213) 402 3262 (fax); tim.thurman@trinlaw.com

ROMANS 8:1-31-39

ARNOLD's promise to the Plaintiff and to the investors that he would not move the money out of the account into which it was wired. The Plaintiff and the investors and Sophia Yoo had made it clear, and ARNOLD had agreed, that the money had to stay in the same account into which it was wired because to remove the money violated Korean law. Therefore, the removal of this money into an interest bearing account constituted fraud by ARNOLD on behalf of DARK HALL. Furthermore, when ARNOLD did finally send Sophia Yoo the copy of the bank statements on June 28, 2007, he sent an abbreviated version of the bank statements and fraudulently altered and forged the bank statement sent to attempt to cover up the fact that he had removed money out of the account and transferred the funds into a different account.

19.    Ultimately, the investors discovered that ARNOLD had moved the money, that he had taken money out for his own use, that he had lied regarding the ability to get A-list talent, had lied regarding adding Sophia Yoo as a member of DARK HALL, had lied regarding whether he had valid chain of title to the script, had lied regarding allowing Sophia Yoo to control the money, and had given Ms. Yoo a forged bank statement. The investors, at the time of the discovery, wanted to pull the money out, especially given that there was never a signed investment agreement or valid contract.

20.    In a saintly effort to save the film, however, the Sophia Yoo met with ARNOLD (and legal counsel for both sides), to see if the film could be saved.

These meetings culminated in a meeting on July 31, 2007, wherein ARNOLD on behalf of himself and DARK HALL, agreed to return 1.7 million dollars to the Plaintiff and Sophia Yoo to be used as the investors saw fit, and to make the movie for only $2 million dollars.  The reduction in the budget for the film was justified because ARNOLD's inability to procure A-list talent.  ARNOLD also agreed to a list of conditions for the film, including, but not limited to the following:

    a.  Procurement of a completion bond;

    b.  Procurement of insurance;

    c.  Procurement of key actor agreement;

    d.  Procurement of a list of bondable line producers;

    e.  Procurement of a list of producers;

    f.  Allowing Sophia Yoo to control the budget;

    g.  Proof of clear chain of title;

    h.  A budget that would satisfy the bond company;

    i.  And a schedule that would satisfy the bond company.

ARNOLD also agreed at the meeting that future communication would be conducted primarily through the lawyers.

    21.    At the completion of the meeting, ARNOLD had drawn up two checks worth approximately $1.7 million and $1.945 million respectively.  The parties then travelled to Bank of America where, the $1.7 million was deposited in Sophia Yoo's personal account (to be used on behalf of the investors), and the

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd, Suite 930
Los Angeles, California 90010
(213) 384 9000; (213) 402 3262 (fax); tim.thurman@trinlaw.com

ROMANS 8:1-31-39

8

$1.945 million was deposited into a joint account between ARNOLD and Sophia Yoo. At the time of the opening of the account, ARNOLD demanded that the bank teller notate that the signatures of both ARNOLD and Sophia Yoo would be necessary to withdraw money, or to sign checks. Neither Sophia Yoo nor the investors ever agreed to any such requirement. Sophia Yoo relented to placing a notation for the two signatures on the account only after the banker explained that the notation was essentially meaningless and that either party could withdraw the money at any point.

22.     Subsequent to the oral settlement agreement reached on July 31st, 2007, ARNOLD did virtually none of the requirements given him at the July 31st meeting. The only item which he arguably completed was the filing of an application for a copyright of the script on August 2, 2007. Other than the filing of the application for a copyright, however, ARNOLD did nothing to further the completion of the project and essentially did not communicate with Sophia Yoo or her attorneys.

23.     At the same time the investors realized that the film likely could not be completed because a clear script could not be realized until the granting of the of the registered copyright, which would not have occurred before December or January of 2009, given the date in which the application for a copyright had been filed.

24.     Given Arnold's inactivity, given that the film could not have been made until December or January, and given that ARNOLD had removed money from the bank account without the investors' permission, the Plaintiff and the

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930
Los Angeles, California 90010
(213) 384 9000; (213) 402 3262 (fax); tim.thurman@trinlaw.com

ROMANS 8:1-31-39

9

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930
Los Angeles, California 90010
(213) 384 9000: (213) 402 3262 (fax): tim.thurman@trinlaw.com

ROMANS 8:1-31-39

investors finally pulled the plug on the project and requested that Sophia Yoo remove the money from the account. This was done on or about August 22, 2009. The removal of the funds was justified given that the money was the investors because there were no signed investor agreements, and because ARNOLD had breached the oral contract arrived at on July 31, 2007 by his complete inactivity.

25.    On or about October of 2007, ARNOLD filed, on behalf of DARK HALL, an action in L.A. Superior Court (*Dark Hall Productions, LLC v. Sun Jee Yoo, et al.*; BC378697). This action was designed simply to extort money from Sophia Yoo and the Plaintiff and the investors, and was filed for improper purposes. The case is still pending in Los Angeles Superior Court.

<u>FIRST CAUSE OF ACTION</u>
FRAUD – INTENTIONAL MISREPRESENTATION
(AGAINST ALL DEFENDANTS)

26.    Plaintiff re-alleges each of the above paragraphs inclusive, of this Complaint and incorporates them herein by this reference.

27.    When he travelled to the Korea in late March and the beginning of April of 2007, ARNOLD made the following representations to the investors and the Plaintiff:

  a.  That he would be able to obtain A-list talent for the movie, including Kevin Costner or Nicholas Cage;

  b.  That he had clear chain of title to the script;

  c.  That he had already formed a production company called DARK HALL PRODUCTIONS, LLC;

  d.  That Sophia Yoo was or would become a member of DARK HALL;

10

e.  That Sophia Yoo would be in control of the money for the movie;

f.  That he would not spend or move any of the money wired from Korea to the DARK HALL accounts without authorization from either the investors or Sophia Yoo; and

g.  That the bank statement provided to Sophia Yoo on June 28, 2007 was a true and correct copy of the bank statement.

28.   These representations were in fact false.  The truth with regard to each statements is the following:

a.  ARNOLD did not have the ability and never should have represented that he would be able to obtain A-list talent;

b.  That he did not have clear chain of title for the script and had not even filed an application to register the copyright for the script;

c.  ARNOLD had yet to form DARK HALL;

d.  Sophia Yoo either did not ever become a member of DARK HALL or became one much too late;

e.  ARNOLD did not allow Sophia Yoo to manage the money for the film and never intended to allow her;

f.  ARNOLD spent money wired from Korea on himself, a script doctor, and a lawyer.  ARNOLD also moved the money out of the account into which it was wired;  and

g.  The bank statement was in fact forged by ARNOLD or his agent in an attempt to deceive the Plaintiff and Sophia Yoo.

29.   The fraudulent representations made by ARNOLD on behalf of himself and DARK HALL, were material in that they were instrumental in getting the Plaintiff and the investors to wire the money to DARK HALL's accounts.  Plaintiff and the investors relied on these representations of ARNOLD before investing in the movie.

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930
Los Angeles, California 90010
(213) 384 9000: (213) 402 3262 (fax): tim.thurman@trinlaw.com

ROMANS 8:1-31-39

11

30.    At the time he made the above representations, ARNOLD knew them to be false, and the statements were made in order to induce reliance by the Plaintiff and the investors.

31.    The reliance by the Plaintiff and the investors were justified in that the Plaintiff and the investors had no knowledge of the falsity of the statements and did not really have the ability to discern the truth of the statements.

32.    The fraud committed by ARNOLD, on behalf of himself and DARK HALL, caused damages to the Plaintiff in the investors in an amount to be proven at trial, but which exceeds $5,000,000.

33.    The fraud committed by ARNOLD was done with malice, oppression and fraud, such that the Plaintiff and the investors are entitled to punitive damages.

## SECOND CAUSE OF ACTION
### BREACH OF ORAL CONTRACT
### (AGAINST ALL DEFENDANTS)

34.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs and incorporate the same as though fully set forth at length.

35.    On or about July 31, 2007, the Plaintiff and the investors entered into an oral contract with Defendant ARNOLD who was acting on behalf of himself and DARK HALL.

36.    The terms of the oral contract were such that ARNOLD on behalf of himself and DARK HALL, agreed to return 1.7 million dollars to the Plaintiff and Sophia Yoo to be used as the investors saw fit, and to make the movie for only $2 million dollars.    The reduction in the budget for the film was justified because ARNOLD's inability to procure A-list talent.    ARNOLD also agreed to a list of conditions for the film, including, but not limited to the following:

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930
Los Angeles, California 90010
(213) 384 9000; (213) 402 3262 (fax); tim.thurman@trinlaw.com

ROMANS 8:1-31-39

12

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930
Los Angeles, California 90010
(213) 384 9000: (213) 402 3262 (fax): tim.thurman@trinlaw.com

ROMANS 8:1-31-39

   a.  Procurement of a completion bond;

   b.  Procurement of insurance;

   c.  Procurement of key actor agreement;

   d.  Procurement of a list of bondable line producers;

   e.  Procurement of a list of producers;

   f.  Allowing Sophia Yoo to control the budget;

   g.  Proof of clear chain of title;

   h.  A budget that would satisfy the bond company;

   i.  And a schedule that would satisfy the bond company.

ARNOLD also agreed at the meeting that future communication would be conducted primarily through the lawyers.

37.    Plaintiff and the investors fully performed any obligations that they had pursuant to the oral contract. Defendants, however, breached the contract by failing to perform virtually every condition set out for ARNOLD at the meeting.

38.    As a result of the breach by ARNOLD and DARK HALL, Plaintiff and the investors have been damaged, in an amount to be proven at trial, but which exceeds $10,000,000.

### THIRD CAUSE OF ACTION
### CONVERSION
### (AGAINST ALL DEFENDANTS)

39.    Plaintiff re-alleges each of the above paragraphs inclusive, of this Complaint and incorporates them herein by this reference.

40.     On or about the end of May and beginning of June of 2007, the Plaintiff and the other investors wired money into the bank account of DARK HALL.  This money, although in the possession of the Defendant(s), continued to be owned by the Plaintiff and the investors because no investment agreement had been finalized.

41.     On or about June 28, 2007, Defendant ARNOLD, on behalf of himself and DARK HALL, removed from the bank account a total of $55,000.  ARNOLD was not authorized to remove this money from the account.  ARNOLD used this money for his own personal use.

42.     Although the Plaintiff has made multiple demands for its return, ARNOLD has yet to return the money.

43.     As a result of the conversion by the ARNOLD, Plaintiff's damages shall be proven at trial, but exceed $5,000,000.

**FOURTH CAUSE OF ACTION**

**NEGLIGENCE**

**(AGAINST ALL DEFENDANTS)**

44.     Plaintiff re-alleges each of the above paragraphs inclusive, of this Complaint and incorporates them herein by this reference.

45.     Defendant ARNOLD and DARK HALL had a duty to Plaintiff and his investors to skillfully manage and to turn over to Sophia Yoo, the management of the budget for the film.

46.     Defendant ARNOLD also, as a writer and director, to provide clear chain of title to the script.  ARNOLD did not ever provide the investors with any proof of a clear chain of title to the project.

47.     Defendant ARNOLD breached his duty by failing to manage the budget for the film, failing to allow Sophia Yoo to manage the money, and failed to ever provide clear chain of title.

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd, Suite 930
Los Angeles, California 90010
(213) 384 9000: (213) 402 3262 (fax): tim.thurman@trinlaw.com

ROMANS 8:1-31-39

48.     As a result of ARNOLD's breach, Plaintiff and the investors have been greatly damaged, all in an amount to be proved at trial, but which exceeds $7,500,000.

## FIFTH CAUSE OF ACTION
### ABUSE OF PROCESS
### (AGAINST ALL DEFENDANTS)

49.     Plaintiff re-alleges each of the above paragraphs inclusive, of this Complaint and incorporates them herein by this reference.

50.     On or about October of 2007, ARNOLD filed, on behalf of DARK HALL, an action in L.A. Superior Court (*Dark Hall Productions, LLC v. Sun Jee Yoo, et al.*; BC378697).  This action was designed simply to extort money from Sophia Yoo and the Plaintiff and the investors, and was filed for improper purposes. The case is still pending in Los Angeles Superior Court.

51.     The Plaintiff and the investors have been damaged by Defendants' actions in an amount to be determined at trial, but which exceeds $948,000 in relevant attorneys' fees alone.

52.     Defendants acted with willful malice, and in conscious disregard of the rights of the Plaintiff, entitling Plaintiff to an award of punitive damages against them.

///

///

///

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd, Suite 950
Los Angeles, California 90010
(213) 384 9000; (213) 402 3262 (fax); tim.thurman@trinlaw.com

*ROMANS 8:1-31-39*

15

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd, Suite 930
Los Angeles, California 90010
(213) 384 9000: (213) 402 3262 (fax): tim.thurman@trinilaw.com

ROMANS 8:1-31-39

## PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

**For the First Cause of Action:**

1.     For general damages in a sum subject to proof at trial but in excess of $5,000,000;

2.     For consequential damages in a sum subject to proof at trial;

3.     For prejudgment interest at the legal rate per annum;

4.     For attorneys' fees subject to proof at trial;

5.     For punitive damages in an amount subject to proof at trial but sufficient to punish Defendants and deter them from similar conduct in the future;

6.     For costs of suit herein incurred; and

7.     For such other relief as the Court may deem just and proper.

**For the Second Cause of Action:**

1.     For general damages in a sum subject to proof at trial but in excess of $10,000,000;

2.     For consequential damages in a sum subject to proof at trial;

3.     For prejudgment interest at the legal rate per annum;

4.     For attorneys' fees subject to proof at trial;

5.     For costs of suit herein incurred; and

6.     For such other relief as the Court may deem just and proper.

**For the Third Cause of Action:**

1.     For general damages in a sum subject to proof at trial but in excess of $5,000,000;

2.     For consequential damages in a sum subject to proof at trial;

3.     For prejudgment interest at the legal rate per annum;

16

PLAINTIFF'S COMPLAINT FOR DAMAGES

4.     For attorneys' fees subject to proof at trial;

5.     For costs of suit herein incurred; and

6.     For such other relief as the Court may deem just and proper.

**For the Fourth Cause of Action:**

1.     For general damages in a sum subject to proof at trial but in excess of $7,500,000;

2.     For consequential damages in a sum subject to proof at trial;

3.     For prejudgment interest at the legal rate per annum;

4.     For attorneys' fees subject to proof at trial;

5.     For costs of suit herein incurred; and

6.     For such other relief as the Court may deem just and proper.

**For the Fifth Cause of Action:**

1.     For general damages in a sum subject to proof at trial but in excess of $1,000,000;

2.     For consequential damages in a sum subject to proof at trial;

3.     For prejudgment interest at the legal rate per annum;

4.     For attorneys' fees subject to proof at trial;

5.     For punitive damages in an amount subject to proof at trial but sufficient to punish Defendants and deter them from similar conduct in the future;

6.     For costs of suit herein incurred; and

7.     For such other relief as the Court may deem just and proper.

DATED: October 14, 2009         TRINITY LAW ASSOCIATES, INC.

By: _Timothy D. Thurman_

Timothy D. Thurman, Esq.
Attorneys for Plaintiff,
CHUL YOON YOO

TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930
Los Angeles, California 90010
(213) 384 9000; (213) 402 3262 (fax); tim.thurman@trinlaw.com

ROMANS 8:1-31-39

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
YOON CHUL YOO, an individual, on behalf of himself and similarly situated investors

**DEFENDANTS**
MATTHEW ARNOLD, an individual; DARK HALL PRODUCTIONS, LLC, a California limited liability company; and DOES 1-10, inclusive

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Timothy D. Thurman, State Bar No. 216048
TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930; Los Angeles, CA 90010 Tel: 213 384 9000

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ MONEY DEMANDED IN COMPLAINT: $ 20,000,000+

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §1332: diversity and more than $75,000 in controversy.  Essentially fraud and breach of contract concerning investment in movie

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY | TORTS PERSONAL INJURY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☒ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus- Alien Detainee | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

CV09-7483

**FOR OFFICE USE ONLY:**   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                CIVIL COVER SHEET                Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No  ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
   ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
   ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
   ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:° | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Plaintiff resides in Seoul, KOREA |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:° | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Both Defendants reside in Los Angeles County |  |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:° | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Claims arose in Los Angeles County |  |

° Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):**  _Timothy D Lee_   Date  October 15, 2009

Notice to Counsel/Parties:   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Margaret M. Morrow and the assigned discovery Magistrate Judge is Carla Woehrle.

The case number on all documents filed with the Court should read as follows:

### CV09- 7483 MMM (CWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=======================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address: Timothy D. Thurman,
State Bar No. 216048
TRINITY LAW ASSOCIATES, INC.
3470 Wilshire Blvd., Suite 930
Los Angeles, California 90010
(213) 384 9000; (213) 402 3262 (fax)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

KWON CHUL YOO, an individual, on behalf of
himself and similarly situated investors

PLAINTIFF(S)

v.

MATTHEW ARNOLD, an individual; DARK HALL
PRODUCTIONS, LLC, a California limited liability
company; and DOES 1-10, inclusive

DEFENDANT(S)

CASE NUMBER

**CV09-7483MMM (CWx)**

**SUMMONS**

TO:   DEFENDANT(S): MATTHEW ARNOLD, an individual; DARK HALL PRODUCTIONS, LLC,
a California limited liability company; and DOES 1-10, inclusive

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer
or motion must be served on the plaintiff's attorney,  Timothy D. Thurman _____, whose address is
3470 Wilshire Blvd., Suite 930, Los Angeles, California 90010 _____. If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint.  You also must file
your answer or motion with the court.

Clerk, U.S. District Court

Dated: October 15, 2009

By:   SHEA BOURGEOIS

Deputy Clerk

SEAL
(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                                SUMMONS

# ATTACHMENT 7

| Attorney or Party without Attorney: | | For Court Use Only |
|---|---|---|
| OLIVER A. TAILLIEU, ESQ., Bar #206546<br>ZUBER & TAILLIEU LLP<br>10866 WILSHIRE BLVD.<br>SUITE 300<br>LOS ANGELES, CA 90024 | | |
| Telephone No: (310) 807-9700   FAX: No: (310) 807-9701 | Ref. No or File No.:<br>95565 | |
| Insert name of Court, and Judicial District and Branch Court:<br>LOS ANGELES COUNTY SUPERIOR COURT-CENTRAL DISTRICT | | |
| Plaintiff: DARK HALL PRODUCTIONS, LLC, ETC. | | |
| Defendant: SUN JEE YOO, ETC., ET AL. | | |

| AFFIDAVIT OF<br>REASONABLE DILIGENCE | Hearing Date: | Time: | Dept/Div: | Case Number:<br>BC378697 |
|---|---|---|---|---|

1. I, JORGE G. SILVA, and any employee or independent contractors retained by 207 SOUTH BROADWAY are and were on the dates mentioned herein over the age of eighteen years and not a party to this action. Personal service was attempted on Defendant CHUL YOON YOO, AN INDIVIDUAL as follows:

2. Documents:  SUMMONS; FIRST AMENDED COMPLAINT; NOTICE OF CASE ASSIGNMENT-UNLIMITED CIVIL CASE; CIVIL CASE SUMMARY.

| Day | Date | Time | Location | R e s u l t s |
|---|---|---|---|---|
| Thu | 08/21/08 | 4:08pm | Home | THIS IS A SECURED RESIDENTIAL APARTMENT BUILDING, SUBJECT'S NAME IS NOT ON THE DIRECTORY. SERVER WAS ABLE TO SNEAK IN AFTER WAITING FOR 20 MINUTES. THERE WAS NO ANSWER AT THE DOOR. SERVER SPOKE WITH APARTMENT MANAGER, WHO WOULD NOT CONFIRM NOR DENY IF SUBJECT LIVES HERE. Attempt made by: JORGE G. SILVA. Attempt at: 871 CRENSHAW BLVD #405 LOS ANGELES CA. 90005. |
| Sat | 08/23/08 | 11:00am | Home | GAINED ACCESS, NO ANSWER AT THE DOOR. Attempt made by: JORGE G. SILVA. Attempt at: 871 CRENSHAW BLVD #405 LOS ANGELES CA. 90005. |
| Sun | 08/24/08 | 5:30pm | Home | GAINED ACCESS, NO ANSWER AT THE DOOR. Attempt made by: JORGE G. SILVA. Attempt at: 871 CRENSHAW BLVD #405 LOS ANGELES CA. 90005. |
| Wed | 08/27/08 | 6:30pm | Home | GAINED ACCESS, NO ANSWER AT THE DOOR. Attempt made by: JORGE G. SILVA. Attempt at: 871 CRENSHAW BLVD #405 LOS ANGELES CA. 90005. |
| Thu | 08/28/08 | 8:00pm | Home | GAINED ACCESS, NO ANSWER AT THE DOOR. Attempt made by: JORGE G. SILVA. Attempt at: 871 CRENSHAW BLVD #405 LOS ANGELES CA. 90005. |
| Sat | 08/30/08 | 9:00am | Home | UNABLE TO GAIN ACCESS, SERVER WAITED AROUND, BUT NO ONE CAME IN OR OUT. Attempt made by: JORGE G. SILVA. Attempt at: 871 CRENSHAW BLVD #405 LOS ANGELES CA. 90005. |
| Mon | 09/01/08 | 7:00pm | Home | GAINED ACCESS BEHIND SOMEONE GOING IN, BUT GOT NO ANSWER AT THE DOOR. Attempt made by: JORGE G. SILVA. Attempt at: 871 CRENSHAW BLVD #405 LOS ANGELES CA. 90005. |

Page Number 1

Date: Mon, Sep. 15, 2008

**AFFIDAVIT OF REASONABLE DILIGENCE**

zubta.21572

077

OLIVER A. TAILLIEU, ESQ., Bar #206546
ZUBER & TAILLIEU LLP
10866 WILSHIRE BLVD.
SUITE 300
LOS ANGELES, CA 90024
*Telephone No:* (310) 807-9700 *FAX No:* (310) 807-9701

*Ref No or File No:* 95565

*For Court Use Only*

*Insert name of Court and Judicial District and Branch Court*
LOS ANGELES COUNTY SUPERIOR COURT-CENTRAL DISTRICT
*Plaintiff:* DARK HALL PRODUCTIONS, LLC, ETC.
*Defendant:* SUN JEE YOO, ETC., ET AL.

| AFFIDAVIT OF REASONABLE DILIGENCE | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:* BC378697 |
|---|---|---|---|---|

| Day | Date | Time | Location | Results |
|---|---|---|---|---|
| Tue | 09/02/08 | 1:15pm | Home | UNABLE TO GAIN ACCESS. Attempt made by: JORGE G. SILVA. Attempt at: 871 CRENSHAW BLVD #405  LOS ANGELES CA. 90005. |
| Thu | 09/04/08 | 9:05pm | Home | UNABLE TO GAIN ACCESS. Attempt made by: JORGE G. SILVA. Attempt at: 871 CRENSHAW BLVD #405  LOS ANGELES CA. 90005. |
| Sat | 09/06/08 | 8:15am | Home | UNABLE TO GAIN ACCESS. Attempt made by: JORGE G. SILVA. Attempt at: 871 CRENSHAW BLVD #405  LOS ANGELES CA. 90005. |
| Sun | 09/07/08 | 5:30pm | Home | GAINED ACCESS, NO ANSWER AT THE DOOR. SERVER KNOCKED ON NEIGHBORS DOOR, BUT NO ONE ANSWERED. Attempt made by: JORGE G. SILVA. Attempt at: 871 CRENSHAW BLVD #405  LOS ANGELES CA. 90005. |
| Tue | 09/09/08 | 11:45am | Home | UNABLE TO GAIN ACCESS, SERVER WAITED FOR 20 MINUTES, BUT NO ONE CAME IN OR OUT. Attempt made by: JORGE G. SILVA. Attempt at: 871 CRENSHAW BLVD #405  LOS ANGELES CA. 90005. |
| Thu | 09/11/08 | 5:00pm | Home | Returned Not Served on: CHUL YOON YOO, AN INDIVIDUAL Home - 871 CRENSHAW BLVD #405 LOS ANGELES, CA. 90005 |

3. *Person Executing*
   a. JORGE G. SILVA
   b. 207 SOUTH BROADWAY
      6TH FLOOR
      LOS ANGELES, CA 90012
   c. (213) 625-9100

*Recoverable Costs Per CCP 1033.5(a)(4)(B)*
d. *The Fee for service was:*
e. *I am:* (3) registered California process server
   (i) Independent Contractor
   (ii) *Registration No.:* 5741
   (iii) *County:* Los Angeles

4. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

Page Number 2
*Date:* Mon. Sep. 15, 2008

**AFFIDAVIT OF REASONABLE DILIGENCE**

(JORGE G. SILVA)

zuba.21552

# ATTACHMENT 8



20

1    OLIVIER A. TAILLIEU (SBN 206546)
     otaillieu@ztllp.com
2    LAURA D. CASTNER (SBN 172362)
     lcastner@ztllp.com
3    ZUBER & TAILLIEU LLP
     10866 Wilshire Boulevard, Suite 300
4    Los Angeles, California 90024
     Telephone: (310) 807-9700
5    Facsimile: (310) 807-9701

6    Attorneys for Plaintiff and Cross-Defendant
     DARK HALL PRODUCTIONS, LLC and
7    Cross-Defendant MATTHEW ARNOLD

8

REC'D

SEP 3 0 2009

FILING WINDOW

FILED
LOS ANGELES SUPERIOR COURT

OCT 01 2009

JOHN A. CLARKE, CLERK
BY BERNICE GUZMAN, DEPUTY

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10              COUNTY OF LOS ANGELES, CENTRAL DISTRICT

11

12   DARK HALL PRODUCTIONS, LLC, a          CASE NO. BC378697
     California limited liability company,
13
             Plaintiff,                      STIPULATION RE: DEPOSITION AND
14                                           TRIAL TESTIMONY OF CHUL YOON
         v.                                  YOO; [PROPOSED] ORDER
15
     SUN JEE YOO aka SUN SOPHIA J. YOO, an
16   individual; CHUL YOON YOO, an individual;  Assigned for all purposes to the Hon. Kevin C.
     DRAGON NOON PRODUCTION, INC., a         Brazile, Dept. 40
17   California corporation; and DOES 1 through
     100, inclusive,                         Action Filed:      October 9, 2007
18                                           Trial Date:        September 28, 2009
             Defendants.
19

20

21

22

23

24

25

26

27

28

1    WHEREAS, CHUL YOON YOO ("Mr. Yoo") is the father of defendant SUN JEE YOO,

2    and was named as a defendant in this action in or about October 2007; and

3    WHEREAS, Plaintiff DARK HALL PRODUCTIONS, LLC was unable to serve the

4    Complaint and the First Amended Complaint in this action upon Mr. Yoo, who is a resident of

5    Korea; and

6    WHEREAS, Plaintiff was previously unable to depose Mr. Yoo in this action due to his

7    status as a resident of Korea; and

8    WHEREAS, trial of this matter is scheduled to begin on September 28, 2009; and

9    WHEREAS, Defendants SUN JEE YOO and DRAGON NOON PRODUCTION INC.

10   have identified Mr. Yoo as one of their witnesses at trial; and

11   WHEREAS, Mr. Yoo is now present in Los Angeles, California for the trial of this action;

12   and

13   WHEREAS, on or about September 23, 2009, the Court issued an order requiring

14   Defendants to make Mr. Yoo available for deposition in this action, or else be precluded from

15   calling Mr. Yoo to testify as a witness at the trial of this matter; and

16   WHEREAS, on September 28, 2009, counsel for Defendants SUN JEE YOO and

17   DRAGON NOON PRODUCTION INC. indicated that he did not intend to call Mr. Yoo as a

18   witness at trial, and inquired whether it would still be necessary for Plaintiff to depose Mr. Yoo;

19   and

20   WHEREAS, Plaintiff is willing to forego a deposition of Mr. Yoo, *provided* that Mr. Yoo

21   not testify at trial for any purpose, including without limitation as a witness in Defendants' case-

22   in-chief, in rebuttal to any testimony elicited by any party from any witness, and with respect to

23   any document(s) identified, offered, or discussed at trial;

24   NOW THEREFORE, IT IS HEREBY STIPULATED between counsel for the parties as

25   follows:

26   1.    CHUL YOON YOO shall not testify at the trial of this action in any capacity or

27   with respect to any subject, either in Defendants' case in chief or in Plaintiff's case in chief.

28   Further, CHUL YOON YOO shall not testify at trial in rebuttal to any testimony elicited by any

party, from any witness. CHUL YOON YOO also shall not testify at trial regarding any document that may be identified, discussed, or offered or admitted into evidence.

2.    In consideration of and for the foregoing, Plaintiff will refrain from taking Mr. Yoo's deposition in this action. Pursuant to the Court's Order dated September 23, 2009, Mr. Yoo shall hereafter be precluded from testifying at the trial of this action.

Dated: September 30, 2009

Respectfully submitted:
ZUBER & TAILLIEU LLP
OLIVIER A. TAILLIEU
LAURA D. CASTNER

By: _____
Attorneys for Plaintiff/Cross-Defendant
DARK HALL PRODUCTIONS, LLC and
Cross-Defendant MATTHEW ARNOLD

Dated: September 30, 2009

Respectfully submitted:
TRINITY LAW ASSOCIATES, LLP
TIMOTHY D. THURMAN
DANIEL KING

By: _____
Attorneys for Defendant/Cross-Complainant
SUN JEE YOO and Defendant DRAGON NOON
PRODUCTION, INC.

[PROPOSED] ORDER

IT IS HEREBY ORDERED THAT:

1.      CHUL YOON YOO shall not testify at the trial of this action in any capacity or with respect to any subject, either in Defendants' case in chief or in Plaintiff's case in chief. Further, CHUL YOON YOO shall not testify at trial in rebuttal to any testimony elicited by any party from any witness.  CHUL YOON YOO also shall not testify at trial regarding any document that may be identified, discussed, or offered or admitted into evidence.

2.      In consideration of and for the foregoing, Plaintiff will refrain from taking Mr. Yoo's deposition in this action.  Pursuant to the Court's Order dated September 23, 2009, Mr. Yoo shall hereafter be precluded from testifying at the trial of this action.


IT IS SO ORDERED.


DATED: _OCTOBER 1_, 2009

_Kevin C. Beagle_
Hon. Kevin C. Brazile
Judge of the Superior Court

# ATTACHMENT 9

20

```
FILED
LOS ANGELES SUPERIOR COURT

OCT 1 5 2009

John A. Clarke, Executive Officer/Clerk
By C. Prescott, Deputy
```

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
# COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| DARK HALL PRODUCTIONS, LLC, a California limited liability company, | CASE NO. BC378697 |
| Plaintiff, | **VERDICTS** |
| v. | Assigned for all purposes to the Hon. Kevin C. Brazile, Dept. 20 |
| SOPHIA JEE YOO aka SOPHIA SOPHIA J. YOO, an individual; CHUL YOON YOO, an individual; DRAGON NOON PRODUCTION, INC., a California corporation; and DOES 1 through 100, inclusive, | Action Filed: October 9, 2007<br>Trial Date: June 8, 2009 |
| Defendants. | |

After all verdict forms have been signed, deliver this verdict form to the Courtroom Attendant.

1006-1001 / 96543.1

# VF-300. Breach of Contract

We answer the questions submitted to us as follows:

1.     Did Matthew Arnold, on behalf of DARK HALL PRODUCTIONS, and SOPHIA YOO enter into any oral contracts?

__X__ Yes          _____ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2.     Did Matthew Arnold, on behalf of DARK HALL PRODUCTIONS, do all, or substantially all, of the significant things that the contract required DARK HALL PRODUCTIONS to do?

__X__ Yes          _____ No

If your answer to question 2 is yes, then skip question 3 and answer question 4. If you answered no, answer question 3.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1006-1001 / 96543.1

2

3. Was DARK HALL PRODUCTIONS, or Matthew Arnold on behalf of DARK HALL PRODUCTIONS, excused from having to do all, or substantially all, of the significant things that the contract required DARK HALL PRODUCTIONS to do?

_____ Yes         _____ No

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Did all the conditions occur that were required for SOPHIA YOO's performance?

__X__ Yes         _____ No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Did SOPHIA YOO fail to do something that the contract required her to do?

__X__ Yes         _____ No

1006-1001 / 96543.1

If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6.    Was DARK HALL PRODUCTIONS harmed by that failure?

X  Yes                _____  No

If your answer to question 6 is yes, then answer question 7. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

7.    What are DARK HALL PRODUCTIONS's damages?

TOTAL   $ 3.7 M

Signed: _____

Presiding Juror

Dated: _10/15/09_____

1006-1001 / 96543.1

## VF-302. Breach of Contract—Affirmative Defense—Duress

We answer the questions submitted to us as follows:

1.     Did SOPHIA YOO use a wrongful act or wrongful threat to pressure Matthew Arnold, on behalf of DARK HALL PRODUCTIONS, into consenting to the contract?

_____X_____ Yes                    _____ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2.     Was Matthew Arnold, on behalf of DARK HALL PRODUCTIONS, so afraid or intimidated by the wrongful act or wrongful threat that he and/or DARK HALL PRODUCTIONS did not have the free will to refuse to consent to the contract?

_____X_____ Yes                    _____ No

If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

/ / /
/ / /
/ / /
/ / /

006-1001 / 96543.1

3.     Would DARK HALL PRODUCTIONS have consented to the contract without the wrongful act or wrongful threat?

_____ Yes          X  No

Signed: _____
Presiding Juror

Dated: _____ 10/15/09 _____

1006-1001 / 96543.1

# VF-1900. Intentional Misrepresentation

We answer the questions submitted to us as follows:

1.    Did SOPHIA YOO make a false representation of an important fact to Matthew Arnold on behalf of DARK HALL PRODUCTIONS?

      ___X___ Yes          _____ No

      If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2.    Did SOPHIA YOO know that the representation was false, or did she make the representation recklessly and without regard for its truth?

      ___X___ Yes          _____ No

      If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3.    Did SOPHIA YOO intend that Matthew Arnold, on behalf of DARK HALL PRODUCTIONS, rely on the representation?

1006-1001 / 96543.1

1     X Yes        ___ No

2

3     If your answer to question 3 is yes, then answer question 4. If you

4 answered no, stop here, answer no further questions, and have the

5 presiding juror sign and date this form.

6

7     4.    Did Matthew Arnold, on behalf of DARK HALL

8 PRODUCTIONS, reasonably rely on the representation?

9

10     X Yes        ___ No

11

12     If your answer to question 4 is yes, then answer question 5. If you

13 answered no, stop here, answer no further questions, and have the

14 presiding juror sign and date this form.

15

16     5.    Was Matthew Arnold's/DARK HALL PRODUCTIONS'

17 reliance on SOPHIA YOO's representation a substantial factor in causing

18 harm to DARK HALL PRODUCTIONS?

19

20     X Yes        ___ No

21

22     If your answer to question 5 is yes, then answer question 6. If you

23 answered no, stop here, answer no further questions, and have the

24 presiding juror sign and date this form.

25 ///

26 ///

27 ///

28 ///

8
VERDICTS

6.   What are DARK HALL PRODUCTIONS's damages?

TOTAL   $ 3.7 M

Signed: _____
Presiding Juror

Dated: _____10|15|09_____

1006-1001 / 96543.1

## VF-1901. Concealment

We answer the questions submitted to us as follows:

1.    Did SOPHIA YOO intentionally fail to disclose an important fact that Matthew Arnold on behalf of DARK HALL PRODUCTIONS did not know and could not reasonably have discovered?

X  Yes            _____ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2.    Did SOPHIA YOO intend to deceive Matthew Arnold, on behalf of DARK HALL PRODUCTIONS, by concealing the fact?

X  Yes            _____ No

If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1006-1001 / 96543.1

Case 2:09-cv-07483-MMM-CW   Document 53   Filed 10/29/09   Page 56 of 95   Page ID
Case 2:09-cv-07483-MMM-CW   Document 96-1   Filed 11/22/11   Page 89 of 117   Page ID
#:2662

3.     Did Matthew Arnold, on behalf of DARK HALL PRODUCTIONS, rely on SOPHIA YOO's deception and was such reliance reasonable under the circumstances?

    X    Yes             _____ No

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4.     Was SOPHIA YOO's concealment a substantial factor in causing harm to DARK HALL PRODUCTIONS?

    X    Yes             _____ No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5.     What are DARK HALL PRODUCTIONS's damages?

TOTAL  $ 3.7 M

Signed: _____
Presiding Juror

Dated: ___10/15/09___

1006-1001 / 96543.1

## VF-1902. False Promise

We answer the questions submitted to us as follows:

1.     Did SOPHIA YOO make a promise to Matthew Arnold, on behalf of DARK HALL PRODUCTIONS, that was important to the transaction?

__X__ Yes          _____ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2.     Did SOPHIA YOO intend to perform this promise when she made it?

_____ Yes          __X__ No

If your answer to question 2 is no, then answer question 3. If you answered yes, stop here, answer no further questions, and have the presiding juror sign and date this form.

3.     Did SOPHIA YOO intend that Matthew Arnold, on behalf of DARK HALL PRODUCTIONS, rely on this promise?

__X__ Yes          _____ No

1006-1001 / 96543.1

12
VERDICTS

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4.   Did Matthew Arnold, on behalf of DARK HALL PRODUCTIONS, reasonably rely on this promise?

_____X____ Yes          _____ No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5.   Did SOPHIA YOO perform the promised act?

_____ Yes          ___X___ No

If your answer to question 5 is no, then answer question 6. If you answered yes, stop here, answer no further questions, and have the presiding juror sign and date this form.

6.   Was Matthew Arnold's/DARK HALL PRODUCTIONS' reliance on SOPHIA YOO's promise a substantial factor in causing harm to DARK HALL PRODUCTIONS?

___X___ Yes          _____ No

1006-1001 / 96543.1

If your answer to question 6 is yes, then answer question 7. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

7.   What are DARK HALL PRODUCTIONS's damages?

TOTAL   $ 3.7 M

Signed: _____

Presiding Juror

Dated: __10|15|09__

VERDICTS

06-1001 / 96543.1

**VF-2100. Conversion**

We answer the questions submitted to us as follows:

1.     Did DARK HALL PRODUCTIONS have a right to possess *or own* the sum of $1,945,000 in the Bank of America joint account?

    X̶ Yes               _____ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2.     Did SOPHIA YOO intentionally prevent Matthew Arnold on behalf of DARK HALL PRODUCTIONS from having access to the $1,945,000 in the Bank of America joint account for a significant period of time ?

    X̶ Yes               ▓ No

If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3.     Did DARK HALL PRODUCTIONS consent?

    _____ Yes               X̶ No

1006-1001/96543.1

If your answer to question 3 is no, then answer question 4. If you answered yes, stop here, answer no further questions, and have the presiding juror sign and date this form.

4.     Was DARK HALL PRODUCTIONS harmed?

_X_ Yes               ____ No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5.     Was SOPHIA YOO's conduct a substantial factor in causing DARK HALL PRODUCTIONS' harm?

_X_ Yes               ____ No

If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

VERDICTS

1006-1001 / 96543.1

6.   What are DARK HALL PRODUCTIONS' damages?

$ 1,945,000

Signed: _____

Presiding Juror

Dated:   10/15/09

17

VERDICTS

006-1001 / 96543.1

## VF-3900   Punitive Damages

We answer the questions submitted to us as follows:

1.     Did SOPHIA YOO engage in the conduct with malice, oppression, or fraud?

_____X_____ Yes          _____ No

Signed: _____

Presiding Juror

Dated: _____10|15|09_____

006-1001 / 96543.1

FILED
LOS ANGELES SUPERIOR COURT

OCT 1 6 2009

John A. Clarke, Executive Officer/Clerk

By C. Prescott, Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| DARK HALL PRODUCTIONS, LLC, a California limited liability company,<br><br><br>Plaintiff,<br><br>vs.<br><br>SUN JEE YOO aka SUN SOPHIA J. YOO, an individual; CHUL YOON YOO, an individual; DRAGON NOON PRODUCTION, INC., a California corporation; and DOES 1 through 100, inclusive<br><br>Defendants. | Case No.: BC 378697<br><br>**DEFENDANTS' VERDICTS** |

After all verdict forms have been signed, deliver this verdict form to the Courtroom Assistant.

1

VERDICTS

# VF-300 BREACH OF CONTRACT

We answer the questions submitted to us as follows:

1.   Did Sophia Yoo and Matthew Arnold and/or Dark Hall Productions enter into a contract?

　　　　　X  Yes　　　　　　　　　＿＿＿＿ No

　If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.


2.   Did  Sophia Yoo do all, or substantially all, of the significant things that the contract required her to do?

　　　　　＿＿＿＿ Yes　　　　　　　　X  No

　If your answer to question 2 is yes, then skip question 3 and answer question 4. If you answered no, answer question 3.

2

VERDICTS

3.    Was Sophia Yoo excused from having to do all, or

substantially all, of the significant things that the contract

required her to do.

_____ Yes        X  No

If your answer to question 3 is yes, then answer question 4.

If you answered no, stop here, answer no further questions,

and have the presiding juror sign and date this form.


4.    Did all the conditions occur that were required for Matthew

Arnold's performance?

_____ Yes        _____ No

If your answer to question 4 is yes, then answer question 5.

If you answered no, stop here, answer no further questions,

and have the presiding juror sign and date this form.


5. Did Matthew Arnold fail to do something that the contract required

him to do?

_____ Yes        _____ No

3

VERDICTS

If your answer to question 5 is yes, then answer question 6.

If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6. Was Sophia Yoo harmed by that failure?

_____ Yes    _____ No

If your answer to question 6 is yes, then answer question 7.

If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

7. What are Sophia Yoo's damages?

TOTAL $ _____

Signed: _____

Presiding Juror

Dated: 10|15|09

4

VERDICTS

VF-1900   INTENTIONAL MISREPRESENTATION

We answer the questions submitted to us as follows:

1.    Did Matthew Arnold make a false representation of an
important fact to Sophia Yoo?

_____ Yes          ✗ No

If your answer to question 1 is yes, then answer question 2.
If you answered no, stop here, answer no further questions,
and have the presiding juror sign and date this form.

2.    Did Matthew Arnold know that the representation was
false, or did he make the representation recklessly and
without regard for its truth?

_____ Yes          _____ No

If your answer to question 2 is yes, then answer question 3.
If you answered no, stop here, answer no further questions,
and have the presiding juror sign and date this form.

3.     Did Matthew Arnold intend that Sophia Yoo rely on the representation?

_____Yes     _____No

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Did Sophia Yoo reasonably rely on the representation?

_____Yes     _____No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Was Sophia Yoo's reliance on Matthew Arnold's representation a substantial factor in causing harm to Sophia Yoo?

_____Yes     _____No

6

VERDICTS

If your answer to question 5 is yes, then answer question 6.

and have the presiding juror sign and date this form.

6. What are Sophia Yoo's damages?

TOTAL $ _____

Signed:

Presiding Juror

Dated:  10|15|09

VERDICTS

# VF 1901. CONCEALMENT

We answer the questions submitted to us as follows:

1.      Did Matthew Arnold intentionally fail to disclose an important fact that Sophia Yoo did not know and could not reasonably have discovered?

_____Yes      __X__ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Matthew Arnold intend to deceive Sophia Yoo by concealing the fact?

_____Yes      _____No

If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

8

---

**VERDICTS**

3.   Did Sophia Yoo rely on Matthew Arnold's deception and was such reliance reasonable under the circumstances?

_____ Yes        _____ No

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Matthew Arnold's concealment a substantial factor in causing harm to Sophia Yoo?

_____ Yes        _____ No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

9

VERDICTS

5. What are Sophia Yoo's damages?

TOTAL: $ _____

Signed:

Presiding Juror

Dated:        10|15|09

10

VERDICTS

# VF 1902. FALSE PROMISE

We answer the questions submitted to us as follows:

1. Did Matthew Arnold make a promise to Sophia Yoo that was important to the transaction?

_____ ✗ ____ Yes  _____ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Matthew Arnold intend to perform this promise when he made it?

_____ ✗ ____ Yes  _____ No

If your answer to question 2 is no, then answer question 3. If you answered yes, stop here, answer no further questions, and have the presiding juror sign and date this form.

3.      Did Matthew Arnold intend that Sophia Yoo rely on this promise?

_____ Yes          _____ No

If your answer to question 3 is yes, then answer question 4.

If you answered no, stop here, answer no further questions,

and have the presiding juror sign and date this form.

4.      Did Sophia Yoo reasonably rely on this promise?

_____ Yes          _____ No

If your answer to question 4 is yes, then answer question 5.

If you answered no, stop here, answer no further questions,

and have the presiding juror sign and date this form.

5.      Did Matthew Arnold perform the promised act?

_____ Yes          _____ No

If your answer to question 5 is no, then answer question 6.

If you answered yes, stop here, answer no further

questions, and have the presiding juror sign and date this

12

VERDICTS

form.

6.    Was Sophia Yoo's reliance on Matthew Arnold's

promise a substantial factor in causing harm to Sophia Yoo?

_____ Yes    _____ No

    If your answer to question 6 is yes, then answer question 7.

If you answered no, stop here, answer no further questions,

and have the presiding juror sign and date this form.

7. What are Sophia Yoo's damages?

TOTAL $_____

Signed: _____

Presiding Juror

Dated: 10/15/09

13

VERDICTS

**FILED**

LOS ANGELES SUPERIOR COURT

OCT 16 2009

John A. Clarke, Executive Officer/Clerk

BY _K. Mason_, DEPUTY
K. Mason

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| DARK HALL PRODUCTIONS, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> SUN JEE YOO aka SUN SOPHIA J. YOO, an individual; CHUL YOON YOO, an individual; DRAGON NOON PRODUCTION, INC., a California corporation; and DOES 1 through 100, inclusive, <br><br> Defendants. | CASE NO. BC378697 <br> (Related with Case No. BC395825) <br><br> **VERDICT - PUNITIVE DAMAGES** <br><br> Assigned for all purposes to the Hon. Kevin C. Brazile, Dept. 20 <br><br> Action Filed: October 9, 2007 <br> Trial Date: June 8, 2009 |

1006-1001 / 97098.1

## Punitive Damages

1. What amount of punitive damages, if any, do you award Dark Hall Productions, LLC?

$ 60,000

Signed: _____

Presiding Juror

Dated: __10|16|09__

After it has been signed, deliver this verdict form to the Courtroom Assistant.

# ATTACHMENT 10

## DARK HALL DAMAGES

| DESCRIPTION | PRIOR COUNSEL | CURRENT COUNSEL | TOTAL |
|---|---|---|---|
| Attorneys fees incurred in the matter involving Dark Hall et al v. Sophia Yoo et al., up through 5-31-11 | $942,457.46 | $21,002.69 | $963,460.15 |
| Attorneys fees incurred as a result of pursuing Bank of America to recover the funds up through 5-31-11 | $22,802.13 | $171,498.90 | $194,301.03 |
| Attorneys fees incurred in the Federal Court Action by Yoon Chul Yoo individually and on behalf of similarly situated investors, against Dark Hall | $48,583.09 | $37,879.52 | $86,453.61 |
| Interest on the $1,945,000.00 from the date it was stolen (8-22-07) until the date it was recovered (2-25-10) at 8% | $391,344.66 | | |
| The other funds which were stolen and not recovered equal to $1,761,141.82 – plus interest from the date the money was converted (7-31-07) by the Yoos at 8% | $176,141.82 | $544,265.20 (as of 6-10-11) | $2,305,407.02 |

| | | | |
|---|---|---|---|
| The $800,000.00 Ms. Yoo received from a Japanese Investor for Dark Hall to meet the $4.5 million dollar budget which was never turned over to Dark Hall plus interest at 8% from July 1, 2007 | $800,000.00 (principal)<br><br>$252,493.15 (Interest) | | $1,052,493.15 (as of 6-10-11) |
| | | | **GRAND TOTAL:**<br><br>$4,993,459.82 (as of 6-10-11) |

P:110133/Matt Arnold/Yoo Appeals/Mics./Dark Hall Damages Chart.6.22.11

# ATTACHMENT 11

```
Amount  :     $1,945,000.00        Sequence Number:  6560698355
Account :     68000512846736       Capture Date:     08/01/2007
Bank Number: 12203717              Check Number:     54086
```





HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK    **OFFICIAL CHECK**    HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

**Washington Mutual Bank**

16-3717/1220    **512846737**

MATCH THE AMOUNT IN WORDS WITH THE AMOUNT IN NUMBERS

WASHINGTON
MUTUAL

Jul 31, 2007 1 MILLION 761 THOUSAND 141 DOLLARS AND 82 CENTS

PAY
TO
THE
ORDER
OF

SUN JEE YOO

DRAWER: Washington Mutual Bank

AUTHORIZED SIGNATURE-
REMITTER
DARK HALL PRODUCTION, LLC

1143 106

Issued by Integrated Payment Systems Inc., Englewood, Colorado Wells Fargo Bank Ltd, N.A., Los Angeles, CA

⑈05l08⑈ ⑆122037171⑆ 6800051284673 7⑈

D  0330

104-1