1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

8

YOON CHUL YOO,                              )   CASE NO. CV 09-07483 MMM (CWx)
                                            )
9                    Plaintiff,             )
                                            )
10          vs.                             )   ORDER GRANTING
                                            )   COUNTERCLAIMANTS' MOTION FOR
11   MATTHEW ARNOLD, an individual;         )   DEFAULT JUDGMENT
     DARK HALL PRODUCTIONS, LLC, a          )
12   California limited liability company; and )
     DOES 1-10, inclusive,                  )
13                                          )
                     Defendants.            )
14   _____)
                                            )
15   MATTHEW ARNOLD, an individual;         )
     DARK HALL PRODUCTIONS, LLC, a          )
16   California limited liability company,  )
                                            )
17                    Counterclaimants,     )
                                            )
18          vs.                             )
                                            )
19   YOON CHUL YOO, an individual; and      )
     DOES 1-10, inclusive,                  )
20                                          )
                     Counterdefendants.     )
21   _____)

22          Yoon Chul Yoo commenced this action against Matthew Arnold, Dark Hall Productions,

23   LLC ("DHP"), and certain fictitious defendants on October 15, 2009.[1]  On October 29, 2009,

24   Arnold and DHP ("counterclaimants") filed a counterclaim against Yoo;[2] they amended the

25

26          [1]Complaint, Docket No. 1 (October 15, 2009).

27

28          [2]Dark Hall and Matthew Arnold's Answer to Complaint and Counterclaim ("Answer"),
     Docket No. 5  (October 29, 2009).

counterclaim on April 13, 2010.[3]  On October 28, 2011, the clerk entered Yoo's default on the counterclaim.[4]  On November 22, 2011, Arnold and DHP moved for entry of default judgment against Yoo.[5]  Yoo did not oppose the motion.  Rather, on July 31, 2012, he filed a motion to set aside the default,[6] which the court denied on October 10, 2012.[7]   The court considers counterclaimants' motion for default judgment herein.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

A.  **Procedural Background**

On October 15, 2009, Yoon Chul Yoo, on behalf of himself and similarly situated investors, commenced this action against Matthew Arnold, Dark Hall Productions, LLC and certain fictitious defendants.[8]  He alleged claims for breach of contract, conversion, negligence, and abuse of process based on investments he and others made in a feature film that was to be produced by defendants.[9]  On October 29, 2009, Arnold and Dark Hall filed an answer that pled counterclaims against Yoo for fraud, conversion, breach of oral contract, promissory estoppel, breach of written contract, and unjust enrichment.  Arnold and Dark Hall subsequently amended

---

[3]First Amended Counterclaim ("Counterclaim"), Docket No. 28 (April 13, 2010).

[4]Default by Clerk Entered as to Counter Defendant Yoon Chul Yoo, Docket No. 97 (Oct. 28, 2011).

[5]Motion for Entry of Default Judgment ("Motion"), Docket No. 96 (Nov. 22, 2011).

[6]Motion to set Aside Default Re: Clerks Entry of Default ("Motion"), Docket No. 101 (July 31, 2012).

[7]Order Denying Motion to Set Aside Default, Docket No. 107 (Oct. 10, 2012).  This order was erroneously captioned Order Denying Motion to Set Aside Default Judgment.

[8]Complaint, Docket No. 1 (October 15, 2009).

[9]*Id.* at 10-17.

the counterclaims,[10] and Yoo filed an answer on August 27, 2010.[11]

On May 10, 2011, noting Yoo's failure to prosecute the case for almost a year, the court dismissed his affirmative claims without prejudice.[12] On July 20, 2011, defendants sought leave to file a motion for summary judgment.[13] The court denied the motion, stating: "Given the procedural posture of this matter, the court believes it would be more expeditious if defendants were to file a motion to strike Yoo's answer to the counterclaims for failure to make discovery and failure to follow court orders."[14] Defendants filed such a motion on August 9, 2011.[15] Yoo did not file opposition, and on October 28, 2011, the court directed the clerk to strike Yoo's answer and enter his default on the counterclaims.[16]

On November 22, 2011, Arnold and DHP moved for entry of default judgment against Yoo.[17] Yoo did not oppose the motion. Rather, on July 31, 2012, he filed a motion to set aside

_____

[10]Dark Hall Productions, LLC's and Matthew Arnold's First Amended Counterclaim ("Counterclaim"), Docket No. 28 (Apr. 13, 2010).

[11]Plaintiff and Counter-Defendant Yoon Chul Yoo ("Yoon Chul Yoo Answer"), Docket No. 51 (Aug. 27, 2010).

[12]Order Dismissing Action for Lack of Prosecution ("Dismissal"), Docket No. 87 (May 10, 2011).

[13]Notice of Motion for Leave to File Counterclaim Defendants' Motion for Summary Judgment or in the Alternative to Set for Trial and Issue a Case Management Schedule, Docket No. 92 (Jul. 20, 2011).

[14]Order Denying Defendants' Motion for Leave to File Motion for Summary Judgment ("Order Denying Leave"), Docket No. 94 (Aug. 9, 2011).

[15]Motion to Strike Counter Defendant's Answer to the Counterclaim ("Motion to Strike Answer"), Docket No. 94 (Aug. 9, 2011).

[16]Order Granting Motion to Strike Counter-Defendant's Answer to the Counterclaim ("Order Striking Answer"), Docket No. 95 (Oct. 28, 2011).

[17]Motion for Entry of Default Judgment ("Motion"), Docket No. 96 (Nov. 22, 2011).

1 his default,[18] which the court denied on October 10, 2012.[19]

2      **B.    Factual Background**

3      The following facts alleged in the counterclaims are taken as true due to Yoo's default.

4 See FED.R.CIV.PROC. 8(b)(6); see also, e.g., *Geddes v. United Fin. Group*, 559 F.2d 557, 560

5 (9th Cir. 1977) (stating the general rule that "upon default[,] the factual allegations of the

6 [pleading], except those relating to the amount of damages, will be taken as true").

7      Arnold is a Californian who is the sole owner and operator of DHP.[20]  Arnold taught film

8 at the New York Film Academy from December 2003 to March 2007.[21]  In February 2007,

9 Arnold was approached by Yoo's daughter, Sun "Sophia" Yoo ("Sophia"), a student of his, who

10 said that Yoo was interested in raising money to finance the production of Arnold's original film,

11 "The Door."[22]  Sophia represented that she and her father intended to raise $4,500,000 by June

12 1, 2007, and convinced Arnold to visit Korea to meet with Yoo and other investors.[23]  He agreed,

13 quit his teaching position, and met with various individuals in Korea.[24]  The investors, all of whom

14 were close friends or business associates of Yoo, agreed to finance production of "The Door" with

15 a $4,500,000 budget in exchange for a share of the film's gross receipts.[25]  Subsequently, Arnold

16 formed DHP and opened a bank account for DHP into which the investment proceeds could be

---

[18]Motion to set Aside Default Re: Clerks Entry of Default ("Motion"), Docket No. 101 (July 31, 2012).

[19]Order Denying Motion to Set Aside Default, Docket No. 107 (Oct. 10, 2012).  This order was erroneously captioned Order Denying Motion to Set Aside Default Judgment.

[20]Counterclaim, ¶ 17.

[21]*Id.*, ¶ 18.

[22]*Id.*, ¶ 21.

[23]*Id.*, ¶¶ 22, 24.

[24]*Id.*, ¶ 26.

[25]*Id.*, ¶ 29.

deposited.[26]  Investors subsequently transferred $3,748,634.26 to the account for production of "The Door."[27]  Counterclaimants allege that an additional $980,000 was invested by a Japanese company, but that those funds were deposited in accounts controlled by Sophia, rather than into DHP's account.[28]

In June 2007, Sophia voiced concern about the split of revenues between investors and her control of the funds in the DHP bank account.  She told Arnold that the investors did not want to make a large profit on the film due to high tax exposure, and that she and Yoo would keep any additional profit.[29]  In early July 2007, Sophia told Arnold that the investors were upset that she was not in control of the money, and demanded that all funds be transferred to a bank account in Korea to make them more comfortable.[30]  On July 25, 2007, Sophia and Yoo's attorney requested a meeting with Arnold, at which they gave him three options: return the money, relinquish some spending control to Sophia and sign an agreement giving the investors more control over the film, or face a lawsuit from Sophia and Yoo.[31]  Arnold agreed to give some spending control to Sophia; their respective attorneys were to work out the details of the new agreement.[32]

At a second meeting on July 31, 2007, Yoo, who said he spoke for all of the investors, unilaterally reduced the budget for the film to $2,000,000.[33]  He demanded that the balance of the

---

[26]*Id.*, ¶ 31.

[27]*Id.*, ¶¶ 34, 35.

[28]*Id.*, ¶¶ 35.  In an affidavit, Arnold states that the Japanese investor agreed to invest only $800,000.  (Affidavit of Matthew Arnold, Docket No. 96-1 (Nov. 22, 2011) ("Arnold Aff."), ¶ 18.)

[29]*Id.*, ¶¶ 37, 38.

[30]*Id.*, ¶ 40.

[31]*Id.*, ¶ 42.

[32]*Id.*, ¶¶ 43, 44.

[33]*Id.*, ¶ 46.

money be returned to the investors through Sophia.  Arnold immediately complied.[34]

In reliance on Yoo's representations, Arnold returned  $1,761,141.82 to the investors through Sophia, opened a new joint account with Sophia at Bank of America, and deposited $1,945,000 in that account for the production budget.[35]  Both Arnold's and Yoo's authorizations were required before funds could be withdrawn or transferred from the joint account.[36]  Soon thereafter, Yoo and Sophia disappeared.[37]  On September 17, 2007, Arnold discovered that the entire sum he deposited in the Bank of America account had been wired-transferred to bank accounts belonging to Sophia.  This occurred in two separate transactions, neither of which Arnold authorized.[38]  Arnold alleges that Sophia and Yoo conspired with each other to obtain the $1,945,000.[39]

The money Arnold had given Sophia to return to the investors was not returned, but was instead used to cover Sophia's companies and/or invested in other film projects.[40]  Later, Arnold discovered that the July meetings were a sham, and that Yoo and Sophia had had multiple meetings with his colleagues, and conspired with them to use the funds raised for "The Door" on unrelated film projects.[41]  In November 2007, in a state court action, DHP obtained an injunction freezing the $1,945,000 taken without Arnold's authorization from the Bank of America joint account.[42]

---

[34]*Id.*, ¶¶ 47, 50.

[35]*Id.*, ¶ 50.

[36]*Id.*

[37]*Id.*, ¶ 51.

[38]*Id.*, ¶¶ 58, 60.

[39]*Id.*, ¶ 84.

[40]*Id.*, ¶ 61.

[41]*Id.*, ¶ 52.

[42]*Id.*, ¶ 65.

## II. DISCUSSION

**A.    Whether Plaintiff Has Complied with Rules 55(b) and 54(c) of the Federal Rules of Civil Procedure and Local Rules 55-1 and 55-2**

A court, in its discretion, may enter default judgment against a party following the entry of that party's default by the clerk under Rule 55(b).  See *Pepsico v. California Security Cans*, 238 F.Supp.2d 1172, 1174 (C.D. Cal. 2002); *Kloepping v. Firemen's Fund*, No. C 94-2684 TEH, 1996 WL 75314, *2 (N.D. Cal. Feb. 13, 1996).  In the Central District of California, motions for default judgment must provide the following information: (1) when and against which party default was entered; (2) the pleading as to which default was entered; (3) whether the defaulting party is an infant or incompetent person, and if so, whether he or she is adequately represented; (4) whether the Soldiers' and Sailors' Civil Relief Act of 1940 applies; and (5) whether notice of the application has been served on the defaulting party if the defaulting party has made an appearance.  FED.R.CIV.PROC. 55(b)(2); CA CD L.R. 55-1, 55-2; *PepsiCo*, 238 F.Supp.2d at 1174.

Counterclaimants' motion for default judgment includes all of the required information. The court directed the clerk to strike Yoo's answer and enter his default on October 28, 2011; the default was entered the same day.[43]  Counterclaimants assert that Yoo is neither a minor nor incompetent, and is not in military service.[44]  Accordingly, the Soldiers' and Sailors' Civil Relief Act of 1940 does not apply.  Counterclaimants served the motion on Yoo on November 22, 2011.[45]

In addition to complying with Rule 55 and the associated Local Rule, counterclaimants' motion complies with Rule 54(c) in that it requests a remedy similar to that sought in the

---

[43]Order Granting Motion at 1; Default by Clerk at 1.

[44]Motion, ¶ 4.

[45]Proof of Service, Docket No. 96 (Nov. 22, 2011)

1  coounterclaims, specifically compensatory damages, costs of suit, and attorneys' fees.[46]

2  Counterclaimants, therefore, have satisfied the procedural prerequisites to the entry of default

3  judgment.

4  **B.    Legal Standard Governing Default Judgment – the *Eitel* Factors**

5  Once a defendant's default has been entered, the factual allegations in the complaint, except

6  those concerning damages, are deemed to have been admitted by the non-responding party.  See

7  FED.R.CIV.PROC. 8(d); see also, e.g., *Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th

8  Cir. 1977) ("The general rule of law is that upon default the factual allegations of the complaint,

9  except those relating to the amount of damages, will be taken as true" (citations omitted)).  The

10  court must still "consider [, however,] whether the unchallenged facts constitute a legitimate cause

11  of action, since a party in default does not admit mere conclusions of law."  10A Charles Alan

12  Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D

13  § 2688, at 63 (1998) (footnote omitted); see also *Cripps v. Life Ins. Co. of North America*, 980

14  F.2d 1261, 1267 (9th Cir. 1992) ("[N]ecessary facts not contained in the pleadings, and claims

15  which are legally insufficient, are not established by default"); *Doe v. Qi*, 349 F.Supp.2d 1258,

16  1272 (N.D. Cal. 2004) ("[Although] the factual allegations of [the] complaint together with other

17  competent evidence submitted by the moving party are normally taken as true . . . this Court must

18  still review the facts to insure that the Plaintiffs have properly stated claims for relief").

19  If the court determines that the allegations in the complaint are sufficient to establish

20  liability, it must then determine the "amount and character" of relief that should be awarded.  10A

21  Wright, Miller, & Kane, *supra*, § 2688, at 63; *Elektra Entertainment Group Inc. v. Crawford*,

22  226 F.R.D. 388, 394 (C.D. Cal. 2005) (the district court has "wide latitude" and discretion in

23  determining the amount of damages to award in a default judgment, quoting *James v. Frame*, 6

24  F.3d 307, 310 (5th Cir. 1993)).

---

[46]Counterclaim at 27-30; Memorandum in Support of Motion for Entry of Default Judgment ("Memo"), Docket No. 96 (Nov. 22, 2011) at 10-14.

8

1    **C.    Whether the *Eitel* Factors Favor the Entry of Default Judgment in**
2    **Counterclaimants' Favor**

3    "The grant or denial of a motion for the entry of a default judgment is within the discretion
4    of the court." *Warner Bros. Entertainment Inc. v. Caridi*, 346 F.Supp.2d 1068, 1071 (C.D. Cal.
5    2004) (citing cases).   In the Ninth Circuit, the court must consider the following factors in
6    exercising its discretion: (1) the possibility of prejudice to the moving parties; (2) the merits of
7    their substantive claims; (3) the sufficiency of the pleading raising the claims; (4) the sum of
8    money at stake in the action; (5) the possibility of a material factual dispute; (6) whether the
9    default was a product of excusable neglect; and (7) the policy favoring decisions on the merits.
10   *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

11              **1.    Possibility of Prejudice to Counterclaimants**

12   The first *Eitel* factor considers whether the moving parties will suffer prejudice if a default
13   judgment is not entered.   *Pepsico*, 238 F.Supp.2d at 1177; see also *Eitel*, 782 F.2d at 1471-72.
14   Absent entry of a default judgment, counterclaimants will most likely be without recourse, given
15   Yoo's demonstrated unwillingness to defend himself against the counterclaims throughout the
16   course of these proceedings.   This factor, therefore, favors entry of a default judgment.

17          **2.    Substantive Merits of the Claims and Sufficiency of the Complaint**

18   The second and third *Eitel* factors assess the substantive merit of counterclaimants' claims,
19   and the sufficiency of their pleading of the claims; they "require that a [party] state a claim on
20   which [it] may recover."   See *Pepsico*, 238 F.Supp.2d at 1175; see also *Discovery*
21   *Communications, Inc. v. Animal Planet, Inc.*, 172 F.Supp.2d 1282, 1288 (C.D. Cal. 2001) ("The
22   Ninth Circuit has suggested that the [ ] two *Eitel* factor[s] involving the substantive merits of
23   Plaintiff's claims and the sufficiency of the complaint [ ] 'require that plaintiff's allegations state
24   a claim on which they may recover,'" quoting *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir.
25   1978)).   The court must therefore evaluate counterclaimants' claims for fraud, conversion, breach
26   of contract, promissory estoppel, and unjust enrichment.

27              **a.    Fraud Claims**

28   In counts one and eight of the counterclaims, DHP and Arnold allege that

9

counterdefendants committed fraud.[47]   To recover for fraud, counterclaimants must prove: "(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage." *Holder v. Home Savings & Loan Ass'n*, 267 Cal.App.2d 91, 108 (1968) (citations omitted).

Both counts are based on the same alleged misrepresentations, i.e., the fact that at the July 31, 2007 meeting, Yoo told Arnold (1) that the investors wanted to begin production of "The Door" immediately, but with a $2,000,000 budget; (2) that $1,761,141.82 of the initial funding would be returned to investors; and (3) that the remaining money would be used to produce the movie, and could be withdrawn from the bank only if jointly authorized by Sophia and Arnold.[48] These representations, counterclaimants allege, were false, because (1) Yoo had no intention of starting production; (2) Sophia and Yoo intended to keep the $1,761,141.82 for themselves, and (3) Sophia intended to withdraw the entire $1,945,000 held in the joint account without DHP's authorization or knowledge.[49]  Yoo allegedly knew that the representations were false when made, and intended that they deceive and defraud counterclaimants.[50]

Although based on the same misrepresentations, the counts are asserted by different parties, and allege different forms of justifiable reliance and damage.  In the first count, DHP alleges that Yoo's misrepresentations induced Arnold to accept a smaller budget than counter-defendants had originally promised for the film, return $1,761,141.82 to Sophia, and transfer $1,945,000 to a bank account controlled jointly by Sophia, in the belief that the money could be withdrawn only if both Arnold and Sophia agreed.[51]  As a result, DHP asserts that it lost the

---

[47]*Id.* at 27, 29.

[48]Counterclaim, ¶ 72 (first cause of action), ¶¶ 130 (eighth cause of action).

[49]*Id.*, ¶¶ 73, 131.

[50]*Id.*, ¶¶ 75, 131.

[51]*Id.*, ¶¶ 76, 132.

10

1    $1,761,141.82 returned to Sophia, and lost control for a period of time of the $1,945,000 that was

2    to be used for production of "The Door."[52]

3         The eighth count is asserted by Arnold and alleges that the misrepresentations induced him

4    to continue working on "The Door," expend effort and resources, and forego other employment

5    opportunities.[53]  He seeks unspecified damages, including, but not limited to, the sums he would

6    have received as compensation for his services as writer, director, and producer of "The Door."[54]

7         Counterclaimants have alleged all of the required elements of their respective fraud claims.

8    Accepting their allegations as true due to Yoo's default, the court concludes that counterclaimants

9    have adequately demonstrated the substantive merit of their fraud claims.

10             **b.    Conversion**

11        DHP also alleges that Yoo wrongfully converted funds belonging to it.[55]  To prevail on a

12   conversion claim, plaintiffs must prove "[their] ownership or right to possession of the property

13   at the time of the conversion; the defendant's conversion by a wrongful act or disposition of

14   property rights; and damages."  *Farmers Ins. Exch. v. Zerin*, 53 Cal.App.4th 445, 451 (1997).

15   The Korean investors transferred $3,748,634.26 to DHP's bank account.[56]  This demonstrates that

16   DHP had a right to possession of that money.  *In re Checking Account Overdraft Litigation*, 694

17   F.Supp.2d 1302, 1323 (S.D. Fla. 2010) ("Plaintiffs unquestionably had the right to possess the

18   funds in their bank accounts upon demand to the bank").  Although $1,945,000 was later

19   transferred to the Bank of America account, that account was to be jointly controlled by Arnold,

20   on DHP's behalf, and Sophia; neither was authorized to spend or transfer funds without the

21   consent of the other.  DHP alleges that Yoo interfered with its ownership interest in the funds by

22

23        [52]*Id.*, ¶¶ 79.

24        [53]*Id.*, ¶ 134.

25        [54]*Id.*, ¶ 136.  Arnold does not quantify or seek an award of these damages in his motion
26   for default judgment.

27        [55]*Id.* at 27.

28        [56]*Id.*, Exh. 2

                                              11

conspiring with Sophia to have her withdraw $1,945,000 from the joint account without Arnold's authorization or knowledge.[57]  These allegations suffice to state a conversion claim and show that the claim has substantive merit.

### c.  Breach of Contract

To prevail on a breach of contract claim, counterclaimants must prove "(1) the contract, (2) plaintiff[s]' performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff[s] therefrom."  *Wall St. Network, Ltd. v. New York Times Co.*, 164 Cal.App.4th 1171, 1178 (2008).

The third count alleges that DHP entered into an oral agreement with counter-defendants, including Yoo, pursuant to which counter-defendants and the investors they represented agreed to provide $4,500,000 to DHP to fund "The Door" in exchange for a share of the film's gross receipts.[58]  DHP asserts that it performed all of its obligations under the contract,[59] but that Yoo refused to tender the $4,500,00 he promised to provide.  It contends that he breached the agreement by inducing DHP to return $1,761,141.82 to Sophia through false representations, withdrawing $1,945,000 from the joint account without authorization from Arnold, and refusing to remit $980,000 that was intended for use in producing "The Door."[60]  DHP asserts that, as a result of Yoo's actions, it was deprived of the production budget Yoo was contractually obligated to provide.[61]  While DHP's allegations that it agreed to return $1,761,141.82 and therefore to modify the contract preclude it from recovering these amounts on a breach of contract claim, the remaining allegations are sufficient to support DHP's first breach of contract claim.

The fourth count asserts a breach of the modification of the financing agreement that took

---

[57]*Id.*, ¶¶ 83-84.

[58]*Id.*, ¶ 89.

[59]*Id.*, ¶ 90.

[60]*Id.*, ¶ 91.

[61]*Id.*, ¶ 92.

place on July 31, 2007.  Under the modified contract, Arnold relinquished some spending control, and undertook to produce the film on a reduced budget of $2,00,000.[62]  Pursuant to the terms of the agreement, DHP returned $1,761,141.82 to Yoo, and transferred $1,945,000 to a joint account at Bank of America.[63]  This money was not to be withdrawn or transferred unless authorized by both Arnold and Sophia.[64]  On September 17, 2007, Arnold discovered that Sophia had conspired with Yoo,[65] and withdrawn all of the money in the Bank of America account without his permission.[66]  As a result, Arnold was left with no budget to produce the film, and DHP was damaged.[67]  This claim adequately pleads all elements of a breach of contract claim as well.

Finally, DHP alleges in count six that it entered into a written agreement with Yoo on May 29, 2007, pursuant to which Yoo and investor Sae Kwang pledged to invest $1,076,078 in production of "The Door," to permit DHP to make the film, and to recoup their investment from film revenues.[68]  DHP asserts that the agreement was partially performed when $1,076,078 was wired to its bank account.[69]  Following that transfer of funds, however, Yoo allegedly conspired with Sophia to induce DHP to return $1,761,141.82 by making false representations and removing funds from the joint account set aside to pay for the film's production.[70]  This conduct frustrated

---

[62]*Id.*, ¶ 47.

[63]*Id.*, ¶ 50.

[64]*Id.*, ¶ 50; Notice of Motion for Default Judgment, Exh. A

[65]Counterclaim, ¶ 84.

[66]*Id.*, ¶¶ 58, 82.

[67]*Id.*, ¶ 97.

[68]*Id.*, ¶ 107.

[69]*Id.*, ¶ 109.

[70]*Id.*, ¶¶ 115-117.

DHP's ability to produce the film in breach of the contract.[71]  These allegations adequately plead the elements of a breach of contract claim.

Because the claims are properly pled, and the allegations are accepted as true due to Yoo's default, DHP has demonstrated the substantive merit of its three breach of contract claims.

### d.    Promissory Estoppel

DHP alleges a promissory estoppel claim in count five.[72]  "Under California law, the required elements to state a claim for promissory estoppel are: '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made[ ] (3) [that is] . . . both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.'"  *B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*, No. C 07-02864 JSW, 2007 WL 3232276, *6 (N.D. Cal. Nov. 1, 2007) (quoting *Laks v. Coast Fed. Sav. & Loan Ass'n*, 60 Cal.App.3d 885, 890 (1976)).  A promise "that is vague, general or of indeterminate application is not enforceable."  *Id.* (quoting *Aguilar v. Int'l Longshoremen's Union Local #10*, 966 F.2d 443, 446 (9th Cir. 1992)).  Furthermore, a promise "must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages."  *Id.* (quoting *Glen Holly Entertainment, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1017 (9th Cir. 2003)).

DHP asserts that Yoo made a clear and unambiguous promise to finance production of "The Door," and transferred $3,748,634.26 to its account purportedly for that purpose.[73]  In reliance on the promise, Arnold engaged producers, casting directors, and other pre-production services for the film between February and August 2007.[74]  DHP alleges, and the court agrees, that this reliance was reasonable and foreseeable, as the intended start date for production was

---

[71]*Id.*, ¶ 119.

[72]*Id.* ¶¶ 98-104.

[73]*Id.*, ¶ 99.

[74]*Id.*, ¶ 101.

September 2007.[75]   It also asserts that its reliance caused it to suffer damage.[76]   Because all necessary elements are pled, DHP has stated a viable promissory estoppel claim that has substantive merit.

### e.    Unjust Enrichment

DHP alleges an unjust enrichment claim in count seven.[77]   "Under California law, the elements of unjust enrichment are: (1) receipt of a benefit; and (2) the unjust retention of the benefit at the expense of another." *Shum v. Intel Corp.*, 630 F.Supp.2d 1063, 1073 (N.D. Cal. 2009) (quoting *Peterson v. Cellco P'ship*, 164 Cal.App.4th 1583, 1593 (2008)).   "The mere fact that a person obtains a benefit from another is not of itself sufficient to require that person to make restitution therefor. . . .   [I]t is required to make restitution only if the circumstances of its receipt or retention are such that, as between the two parties, the retention of the benefit is unjust." *Id.* (quoting *Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc.*, 94 Cal.App.4th 151, 171 n. 23 (2001)).   "As a matter of law, an action for unjust enrichment does not lie where an express binding agreement exists and defines the parties' rights." *Id.* (quoting *Cal. Med. Ass'n*, 94 Cal.App.4th at 172).

DHP alleges that Yoo received a benefit when Arnold gave Sophia $1,761,141.82 to return to investors, which Sophia and Yoo allegedly conspired to take and use for other projects.[78]   It also asserts that Yoo unfairly profited at its expense when his co-conspirator, Sophia, deposited $1,945,000 that was set aside for production of "The Door" into her account.[79]   Finally, DHP contends that Yoo unjustly enriched himself by retaining $980,000 transferred by a Japanese

---

[75]*Id.*, ¶ 102.

[76]*Id.*, ¶ 103.

[77]*Id.* at 29.

[78]*Id.*, ¶ 122.

[79]*Id.*, ¶ 124.

company for production of "The Door."[80]  These allegations are based on the same conduct as the breach of contract claims.  As the court has already concluded that express agreements defined the parties' rights regarding the money sought by DHP, the unjust enrichment claim is not viable.  *Id.*  Appropriate relief can be obtained through the breach of contract claims.

### f.  Conclusion Regarding the Second and Third *Eitel* Factors

Counterclaimants have alleged viable claims for fraud, conversion, breach of contract, and promissory estoppel.  Because their allegations must be accepted as true, the claims have been shown to have substantive merit.  Consequently, the second and third *Eitel* factors favor entry of default judgment on the claims except counterclaimaints' breach of contract claims.

### 3.  Amount at Stake

The fourth *Eitel* factor balances "the amount of money at stake in relation to the seriousness of the [d]efendant's conduct."  *Pepsico*, 238 F.Supp.2d at 1175; see also *Eitel*, 782 F.2d at 1471-72.  If the sum at stake is disproportionate to the seriousness of the conduct, default judgment is disfavored.  Counterclaimants seek $4,993,459.82 in damages, including attorneys' fees and interest on the amounts of which they were wrongfully deprived.  The factual allegations in the complaint reflect that they were originally promised a $4,500,000 production budget for "The Door."  Of this amount they received $3,748,634.26, but did not receive an additional $980,000 contributed by a Japanese investor.  They were then fraudulently induced to return $1,761,141.82, and lost control of an additional $1,945,000 for some years after it was wrongfully withdrawn from the joint bank account.   Counterclaimants assert that they have incurred sizable attorneys' fees in an effort to recover the amounts due.  Given his refusal to defend the counterclaims, Yoo has offered no explanation that might diminish the seriousness of his misconduct and weigh against the entry of a default judgment.  The court finds, consequently, that the fourth *Eitel* factor favors entry of default judgment in counterclaimants' favor.

### 4.  Possibility of Dispute

The next *Eitel* factor considers the possibility that material facts are disputed.  *Pepsico*, 238

---

[80]*Id.*

16

F.Supp.2d at 1177; *Eitel*, 782 F.2d at 1471-72.  Yoo has made no attempt to appear or defend the counterclaims for more than a year.  He has admitted all of the allegations in the counterclaims by failing to participate in the litigation, and allowing his answer to be stricken and his default entered.  Consequently, this factor weighs in favor of granting the motion for entry of default judgment.

### 5.    Possibility of Excusable Neglect

The sixth *Eitel* factor considers whether Yoo's default may have resulted from excusable neglect.  *Pepsico*, 238 F.Supp.2d at 1177; see also *Eitel*, 782 F.2d at 1471-72.  In August 2010, Yoo's former attorney represented that Yoo had not actively participated in the case since May 2010, more than two years ago.[81]  Since then, he has failed to respond to an order to show cause regarding lack of prosecution, failed to oppose the striking of his answer, and failed to oppose the entry of his default.   Although a new attorney for Yoo filed a notice of appearance on July 20, 2012, that attorney did not explain Yoo's longstanding refusal to participate in the case – the type of explanation necessary to establish that Yoo's neglect was excusable.[82]  The record demonstrates that Yoo has chosen affirmatively not to participate in the litigation.   Accordingly, this factor weighs in favor of the entry of default judgment.

### 6.    Policy Favoring Decisions on the Merits

"Cases should be decided upon their merits whenever reasonably possible."  *Eitel*, 782 F.2d at 1472.   The mere enactment of Rule 55(b) indicates, however, that "this preference, standing alone, is not dispositive."  *Pepsico*, 238 F.Supp.2d at 1177 (quoting *Kloepping*, 1996 WL 75314 at *3).  Rule 55(a) allows a court to decide a case before a hearing on the merits if defendant fails to appear and defend.  See *Pepsico*, 238 F.Supp.2d at 1177 ("Defendant's failure to answer Plaintiffs' Complaint makes a decision on the merits impractical, if not impossible").  Since Yoo has failed to participate in the action, the seventh *Eitel* factor does not preclude the

---

[81]See Declaration of Sean Andrade ("Andrade Decl."), Docket No. 49 (Aug. 26, 2010), ¶ 15 (declaration filed in August stating that Yoo "has made no effort to communicate with counsel or participate in this action in the past three months").

[82]Notice of Appearance, Docket No. 100 (Jul. 20, 2012).

entry of default judgment against him.

### 7.  Conclusion Regarding the *Eitel* Factors

All of the *Eitel* factors weigh in favor of the entry of default judgment.  Consequently, the court grants counterclaimants' motion as to all causes of action except the unjust enrichment claim.

### D.  The Character and Amount of Counterclaimants' Recovery

Counterclaimants seek compensatory damages, attorneys' fees, and prejudgment interest.[83]  Under Rule 8(a)(3), their demand for relief must be specific, and they "must 'prove up' the amount of damages." *Philip Morris USA Inc. v. Banh*, No. CV 03-4043 GAF (PJWx), 2005 WL 5758392, *6 (C.D. Cal. Jan. 14, 2005); *Elektra Entertainment Group, Inc. v. Bryant*, No. CV 03-6381 GAF (JTLx), 2004 WL 783123, *5 (C.D. Cal. Feb. 13, 2004) ("Plaintiffs must 'prove up' the amount of damages that they are claiming").  Rule 54(c) limits the relief that can be sought in a motion for entry of default judgment to that identified in the complaint.  FED.R.CIV.PROC. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings").  See also *Pepsico*, 238 F.Supp.2d at 1174 (stating that a default judgment "shall not be different in kind from or exceed in amount that prayed for in the [complaint]").

### 1.  Compensatory Damages

"Compensatory damages . . . serve to return the plaintiff to the position he or she would have occupied had the harm not occurred." *Schneider v. County of San Diego*, 285 F.3d 784, 795 (9th Cir. 2002).  DHP seek two different amounts as compensatory damages: (1) $1,761,141.82, the amount converted by Yoo on July 31, 2007, when he convinced Arnold to return a portion of the funds for "The Door" to Sophia; and (2) the $800,000 that Yoo received from a Japanese investor for production of "The Door," but did not make available to DHP.[84]

In an affidavit accompanying the motion, Arnold asserts that, because Yoo fraudulently induced him to do so, he agreed to transfer $1,761,141.82 to Sophia so that the money could be

---

[83]Proposed Order at 3.  The amount sought includes attorneys' fees incurred in three different actions purportedly related to the contracts at issue, as well as $2,305,407.02 in funds that were wrongfully taken and not recovered.

[84]Proposed Order at 2.  As noted, Arnold does not seek damages on his fraud claim.

returned to the investors.[85]  He also states that in 2007, Yoo and Sophia confirmed the receipt of $800,000 from a fourth investor that was meant to be used in production of "The Door," but was instead kept in accounts controlled by Sophia.[86]  This is less than the $980,000 DHP's counterclaims alleged had been withheld.[87]  Nonetheless, an affidavit is sufficient to "prove up" damages, and counterclaimants have sufficiently demonstrated that DHP was injured in the amount of the compensatory damages they seek.  See *Bd. of Trustees of the Boilermaker Vacation Trust v. Skelly, Inc.*, 389 F.Supp.2d 1222, 1226 (N.D. Cal. 2005) (finding that affidavits were an acceptable way to prove damages, and stating "[p]laintiff has the burden of proving damages through testimony or written affidavit").  See also *Great Am. Ins. Co. v. Employers Assur. Services, Inc.*, No. CV 03-9132-GAF (JTLx), 2005 WL 6211335, *5 (C.D. Cal. June 28, 2005) ("Damages may be decided for a default judgment without a hearing if . . . they are capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits").

DHP's pleadings and evidence demonstrate, however, that it has already been awarded judgment in the amount of $3,700,000 in a prior case asserting fraud and breach of contract claims against Sophia, based on the same facts alleged here.  Because it was Sophia that received and retained the $800,000 and $1,761,141.82 DHP now seeks from Yoo, and because those sums constitute part of the $4.5 million that Sophia initially promised investors would provide to DHP to finance "The Door," it is reasonable to assume that some part of the jury's award of $3,700,000 in the prior proceeding was meant to compensate DHP for the same injuries for which it now seeks compensation.  This raises the danger of duplicative recoveries for the same injury, which "the law abhors."  *Bogan v. City of Boston*, 489 F.3d 417, 425 (1st Cir. 2007).  As California courts have held:

"An injured person is entitled to only one satisfaction of judgment for a single

---

[85]Arnold Affidavit, ¶¶ 39-40.

[86]*Id.*,¶ 18.

[87]Counterclaim,¶ 35.

19

harm, and full payment of a judgment by one tortfeasor discharges all others who may be liable for the same injury. This rule, designed to prevent double recovery and never-ending litigation by dissatisfied claimants, applies whether a single judgment has been obtained against joint or concurrent tortfeasors, whether separate judgments of equivalent or disparate amounts have been obtained against tortfeasors, or whether no other judgment has been obtained against other tortfeasors." *Fletcher v. Cal. Portland Cement Co.*, 99 Cal.App.3d 97, 99–100 (1979).

See also *Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1230 (9th Cir. 1989) ("It is a fundamental legal principle that an injured party is ordinarily entitled to only one satisfaction for each injury").

"[W]here fewer than all of the joint tortfeasors satisfy less than the entire judgment," however, "such satisfaction will not relieve the remaining tortfeasors of their obligation under the judgment. Stated otherwise, 'partial satisfaction has the effect of a discharge *pro tanto*.'"[88] *McCall v. Four Star Music Co.*, 51 Cal.App.4th 1394, 1399 (1996) (citing 5 B. Witkin, SUMMARY OF CAL. LAW, Torts, § 57, at pp. 116–117 (9th ed. 1988); *Winzler & Kelly v. Super. Ct.*, 48 Cal.App.3d 385, 392 (1975); *Watson v. McEwen*, 225 Cal.App.2d 771, 774-75 (1964)). Arnold's affidavit indicates that DHP recovered only $1,945,000 of the judgment it obtained against Sophia; this consisted of funds from the joint account that were attached early in the state case and were ordered turned over to DHP.[89] The court finds this evidence sufficient to demonstrate that the state court judgment was never fully satisfied, and that an award of compensatory damages in this case will not be duplicative.[90] Cf. *Regents of University of*

---

[88] "Pro tanto" means "for so much." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1822 (16th ed. 1971).

[89] Arnold Aff., ¶ 53.

[90] While counterclaimants proffer evidence that $1,945,000 was wrongfully taken from them when Sophia withdrew this sum from the joint bank account (*Id.*, ¶ 43), they do not seek this amount as damages. Instead, as discussed *infra*, they seek interest on the money for the period during which they did not have possession of it. There is therefore no risk of double recovery of the $1,945,000.

*California v. Bernzomatic*, No. CIV. 2:10–cv–1224 FCD GGH, 2011 WL 666912, *4 (E.D. Cal. Feb. 11, 2011) ("Because the employees have not recovered from defendants and because plaintiff's damages take the form of the employees' alleged share of damages against defendants, there is no risk of double recovery merely because plaintiff has intervened in a state court suit involving a wholly different defendant"); cf. *Sunkist Growers, Inc. V. Fisher*, 104 F.3d 280, 285 (9th Cir. 1997) (holding, in a Perishable Agricultural Commodities Act case, that where a seller of oranges had obtained a state court judgment against the buyer for breach of contract, but the buyer did not satisfy the state court judgment before it went out of business, that the seller could sue the owners and officers of the buyer in federal district court to recover the same damages).

Accordingly, the court will award DHP compensatory damages of $2,561,141.82.

### 2.     Interest on the Judgment

DHP also seeks prejudgment interest, but does not identify the statute or cause of action that authorizes an award of interest.  Under California Civil Code § 3287(a), "[e]very person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt."  *Evanston Ins. Co. v. OEA, Inc.*, 566 F.3d 915, 920 (9th Cir. 2009).  As the California Supreme Court has explained, "[d]amages are deemed certain or capable of being made certain within the provisions of subdivision (a) of section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage."  *Stonebrae, L.P. v. Toll Bros., Inc.*, No. C–08–0221 EMC, 2011 WL 1334444, *21 (N.D. Cal. Apr. 7, 2011) (citing *Leff v. Gunter*, 33 Cal.3d 508, 519 (1983)).  Hence, "the test for recovery of prejudgment interest under § 3287(a) is whether the defendant actually knows the amount owed or from reasonably available information could have computed that amount."  *Id.* (citing *Duale v. Mercedes–Benz USA, LLC*, 148 Cal.App.4th 718, 728–29 (2007)).

DHP requests that the court award prejudgment interest on the $1,761,141.82 that Yoo induced Arnold to transfer to Sophia's accounts, and the $800,000 in investor funds that Yoo

withheld from it at the rate of 8%. It also seeks prejudgment interest on the $1,945,000 that Yoo conspired to have Sophia withdraw from the joint account with Arnold at the same rate. The basis for the proposed 8% interest rate is unclear. As noted, DHP identifies no legal basis for the prejudgment interest request. Where tort damages are recovered, courts have generally applied a prejudgment interest rate of 7% per annum. See *Family Tree Farms, LLC v. Alfa Quality Produce, Inc.*, No. 1:08–cv–00481–AWI–SMS, 2009 WL 565568, *9 (E.D. Cal. Mar. 5, 2009) ("[B]ecause there is no legislative act specifying the rate of prejudgment interest for a fraud claim, the rate set forth in Cal. Const., art. XV, § 1, of seven per cent per annum, is applicable to the award of tort damages. . . . Plaintiff has not established entitlement to prejudgment interest of ten per cent on the tort claims"); *Children's Hospital and Medical Center v. Bonta*, 97 Cal.App.4th 740, 775 (2002), cert. denied, 537 U.S. 1160 (2003).

California has set the applicable rate of annual interest at 10 percent per annum where the basis for recovery is contractual in nature. See CAL. CIV. CODE § 3289(b) ("If a contract entered into after January 1, 1986 does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach"). As stated, the facts alleged by DHP, which the court takes as true for the purpose of this motion, establish that Yoo is liable in the amounts claimed, *inter alia*, because he breached a contract to provide funds for production of "The Door." Accordingly, the court will award counterclaimants prejudgment interest, if any, at the rate of 10% per annum. *Id.*

DHP also requests interest on the $1,945,000 withdrawn from Arnold's bank account, from and after the date it was withdrawn until the date it was recovered, February 25, 2010. It seeks interest on the unrecovered funds for which judgment will be awarded in this suit from the date those sums were converted until the date of judgment. This method of calculation is consistent with the manner in which California courts have awarded prejudgment interest against a joint tortfeasor where another joint tortfeasor settles, reducing *pro tanto* the amount of the judgment. *Newby v. Vroman*, 11 Cal.App.4th 283, 287-90 (1992) "(a plaintiff, who in good faith settles with a joint tortfeasor before judgment against a nonsettling joint tortfeasor, may thereafter recover from the nonsettling defendants: (a) prejudgment interest up to the date of settlement on the total

judgment; and (b) prejudgment interest after the date of settlement only on the balance of the total judgment remaining after its reduction by the settlement sum paid").

DHP has adduced evidence that Yoo breached the contract by wrongfully converting $1,716,141.82 on July 31, 2007; by wrongfully withholding $800,000 commencing July 1, 2007; and by converting $1,945,000 on August 22, 2007.  It reports that it recovered $1,945,000 on February 25, 2010.[91]  Accordingly, the court will award DHP prejudgment interest at the rate of 10% on

1.   $1,761,141.82,  for the period from July 31, 2007 to March 21, 2013; this amounts to $993,959.49;

2.   $800,000,  for the period from July 1, 2007 to March 21, 2013; this amounts to $458,082.19; and

3.   $1,945,000,  for the period from August 22, 2007 to February 25, 2010; this amounts to $489,180.82.

**3.    Attorneys' Fees**

"California Civil Code § 1717(a) allows for recovery of contractual attorneys' fees only where the action was 'on a contract.'"  *21X Capital Ltd. v. Werra*, 418 Fed. Appx. 605, 2011 WL 759954, *1 (9th Cir. Mar. 4 2011) (Unpub. Disp.).  Under California law, only reasonable attorneys' fees can be recovered.  *In re SNTL Corp.*, 571 F.3d 826, 842 (9th Cir. 2009).  The investor agreements between DHP, on the one hand, and Yoo and the other investors, on the other, state: "If any legal action . . . is brought for the enforcement of this Agreement, or because of any dispute . . . in connection with this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorney's fees and other costs. . . ."[92]  DHP seeks $963,460.15 in

---

[91]See Proposed Order, Docket No. 96-2 (Nov. 22, 2011), ¶ 2(f); Arnold Affidavit, Attachment 10.

[92] Investors Agreement at 6.

23

attorneys' fees incurred in litigating the state court action against Sun;[93] $86,453.61 in attorneys' fees incurred in litigating this action against Yoo; and $194,301.03 in attorneys' fees incurred in litigating an action against Bank of America.[94]

DHP cannot recover attorneys' fees from Yoo for the suit against Bank of America. The investor agreement provides a right to attorneys' fees only in the event a lawsuit is filed to enforce the agreement or to resolve a dispute surrounding the agreement.[95] The Bank of America action concerned an agreement between Bank of America and DHP; DHP alleged that Bank of America did not follow the agreed procedure when it allowed Sun to withdraw money without Arnold's consent.[96] The suit did not seek to enforce the investor agreement or to resolve a dispute about that agreement.

Additionally, DHP cites no authority that would permit the court to award attorneys' fees in the separate state court action. Counterclaimants could have sought fees in that action – indeed, they do not affirmatively indicate that they did not do so. Moreover, Yoo was dismissed as a defendant in the state court action; the court may not, therefore, award the fees incurred in that action against Yoo; those fees can be recovered, if at all, from Sophia, over whom the court has no jurisdiction. Consequently, the court denies the prayer for attorneys' fees incurred in actions other than this one.

"On a motion for default judgment, . . . Local Rule 55-3 states that the fees shall be calculated according to a certain schedule." *Bravado Int'l Group Merch. Services, Inc. v. Cha*, No. CV 09-9066 PSG (Cwx), 2011 WL 651851, *5 (C.D. Cal. Feb. 11, 2011). Because

---

[93]On October 15, 2009, a jury in Los Angeles Superior Court returned a verdict in favor DHP and against Sun related to the issues raised in this case. Yoo was a defendant in the case, but was dismissed without prejudice after DHP failed to serve him because he resided in Korea. (Answer, ¶ 14.)

[94]Arnold sued Bank of America for releasing the funds to Sun without his authorization, and despite the fact that the account explicitly required that Sun and Arnold be present and sign before any withdrawals were made. (Answer, Exh. 3.)

[95]Investors Agreement at 6.

[96]Counterclaim, ¶¶ 58-59.

counterclaims are entitled to judgment in an amount greater than $100,000, under the schedule, their attorneys' fee award equal $5,600 plus 2% of the amount over $100,000. CACD L.R. 55-3. DHP seeks $86,453.61 in fees, an amount within the $93,647.28 to which they would be entitled under the schedule. The court therefore awards the full amount of attorneys' fees requested for this action.

### III. CONCLUSION

For the reasons stated, counterclaimants' motion for default judgment is granted. The court will enter judgment in the amount of $4,588,817.93, comprised of $2,561,141.82 in compensatory damages, $1,941,222.50 in prejudgment interest, and $86,453.61 in attorneys' fees.

DATED: March 25, 2012

_____

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE